# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1113

_____

Marie L. Flynn,                                    *
                                                   *
            Appellant,                             *
                                                   *
      v.                                           *      Appeal from the United States
                                                   *      District Court for the
Michael J. Astrue, Commissioner                    *      Southern District of Iowa.
of Social Security,                                *
                                                   *
            Appellee.                              *
                                                   *

_____

Submitted: October 19, 2007
Filed: January 17, 2008

_____

Before LOKEN, Chief Judge, GRUENDER and BENTON, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Marie L. Flynn appeals the decision of the district court[1] to affirm the final decision of the Commissioner of Social Security denying her application for social security disability benefits and supplemental security income. For the reasons discussed below, we affirm.

_____

[1]The Honorable Charles R. Wolle, United States District Judge for the Southern District of Iowa.

## I.    BACKGROUND

Flynn applied for social security disability benefits and supplemental security income in March 2003.  She has received treatment for fibromyalgia since 1998, and she contends that she became disabled on October 11, 2002, due to her fibromyalgia, depression and severe headaches.

Beginning in 1998, Flynn sought treatment from Dr. Yogesh Gandhi for her complaints of achiness, depression, sleepiness and lack of energy.  Dr. Gandhi recommended that Flynn see Dr. Mary Radia, a rheumatologist.  In November 2001, Dr. Radia concluded that Flynn had fibromyalgia.  Throughout 2002 and 2003, Flynn saw Dr. Radia numerous times for increased pain and stiffness.  Dr. Radia observed that Flynn had good muscle strength and mobility.  She prescribed Flynn prescription and non-prescription medicine to relieve the pain and encouraged Flynn to exercise.

In 2003, Dr. Jacqueline Stoken began treating Flynn.  Dr. Stoken diagnosed Flynn with fibromyalgia; cervical, thoracic and lumbar pain; muscle spasms; restless legs syndrome; unspecified nutritional deficiency; and somatic dysfunction of the head, neck, thorax, ribs, lumbosacral region, pelvis and bilateral lower extremities.  She also found that Flynn had full muscle strength.  She told Flynn to exercise and noted in a follow-up that Flynn's condition improved.  Dr. Stoken also continued to find that Flynn's muscle strength remained normal.

In April 2003, Flynn completed a questionnaire detailing her ability to complete daily tasks.  She responded that she regularly took care of laundry, dishes and changing sheets with help; cooked one meal a day, five days a week, with help; grocery shopped one to two times a week; watched her grandson occasionally; and drove almost daily.

In June 2003, a residual function capacity assessment by Dr. Claude Koons, a non-treating state agency medical consultant, determined that Flynn could

-2-

occasionally lift and/or carry ten pounds, frequently lift and/or carry less than ten pounds, stand and/or walk (with normal breaks) at least two hours in an eight-hour workday, sit (with normal breaks) about six hours in an eight-hour workday, and push and/or pull with unlimited restrictions, other than as described for lifting and carrying. Dr. John May, another non-treating state agency medical consultant came to the same conclusion in October 2003.

Flynn also received treatment for her depression in 2003. Dr. Suzan Simmons, a psychologist who also saw Flynn in 1995, examined Flynn and noted that Flynn had recurrent major depression that was mild and controlled with medication. She believed that Flynn was managing her medical issues and doing well psychologically and encouraged Flynn to exercise daily. Dr. Dee Wright and Dr. Herbert Notch, two non-treating state agency psychologists, observed Flynn in 2003. Dr. Wright found that Flynn was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods of time, work in coordination with or proximity to others without being distracted by them, complete a normal workday without interruptions from psychologically based symptoms and get along with others without distracting them. Dr. Notch agreed with Dr. Wright's assessment.

In December 2003, Flynn underwent an appendectomy. At follow-up examinations in 2004, Dr. Robert Kuhl found she was recovering well from the surgery, released her to full normal activity and told her to exercise. Flynn also saw Dr. Sara Alexander, her oncologist, in 2004 over concerns that she had a recurrence of cancer that she battled in 1991. Dr. Alexander found that Flynn was healthy and should focus on good nutrition and increased physical activity.

In January 2004, Dr. Radia completed a questionnaire concerning Flynn's capabilities for the Social Security Administration in preparation for her hearing. Dr. Radia's responses contained apparent inconsistencies. She rejected the Social Security Administration's assessment that Flynn could lift and/or carry ten pounds

occasionally but then wrote on the form that she believed Flynn could lift and/or carry ten pounds occasionally. She rejected the assessment that Flynn could lift and/or carry ten pounds frequently but then wrote that Flynn could lift and/or carry twenty-five pounds frequently. She also indicated that Flynn could stand and walk only to change positions and not for work-related activities, could sit for less than six hours, and needed to change positions on an hourly basis to relieve pain. Dr. Radia wrote that Flynn and patients with fibromyalgia should not climb, stoop, kneel, crouch or crawl and should seldom reach, handle, finger and feel objects. Dr. Radia then noted that while medication would help Flynn, Flynn's condition was incurable and would affect her ability to work.

Throughout 2004, Flynn also sought treatment for her headaches and pains. Dr. Gandhi diagnosed Flynn with a headache and sinus infection. Dr. Radia suggested that the headaches were a result of Flynn's use of analgesics. Dr. Steven Reeves determined her headaches were not migranes and prescribed medication for Flynn. Dr. Reeves also found that her fibromyalgia was stable.

At the disability hearing before an Administrative Law Judge ("ALJ") on November 2, 2004, Flynn testified that she quit her job as a receptionist and billing clerk because her pain and depression prevented her from working and she did not feel good about her quality of work. She testified that she could lift ten pounds but struggled to carry a gallon of milk. It was hard for her to stand more than ten minutes, and she frequently woke up three to four times in the middle of the night. She also complained of severe headaches and fatigue. Her husband did the cooking, she had no hobbies and she did not drive. Flynn said her pain level was a seven or eight out of ten. She also testified that riding in a car was unbearable but that she traveled an hour and fifteen minutes in a car to arrive at the hearing. She further testified that she flew to Mexico in 2004 for an eleven-day trip for her son's wedding, but she had a headache after the flight.

The ALJ asked a vocational expert to testify as to whether a hypothetical person with Flynn's limitations could work. The ALJ described the hypothetical person as: (1) being limited to lifting twenty pounds occasionally and ten pounds frequently; (2) able to sit, stand or walk, with normal breaks, for six hours in an eight-hour workday; (3) unable to use ropes and scaffolds; (4) having problems bouncing, stooping, kneeling, couching and crawling; and (5) retaining no significant limitation of ability to understand, carry out and remember instructions, use judgment and deal with changes in a work setting. The vocational expert testified that such a person could perform the job of receptionist/billing clerk as Flynn had performed that job and as it was performed in the national economy. The expert also testified that Flynn could perform her previous work as a cashier as it was performed in the national economy but not as she had performed it. If Flynn needed to stand up and stretch each hour, she could still perform her job as a receptionist/billing clerk.

On January 27, 2005, the ALJ denied Flynn's claim. The ALJ discussed Flynn's allegations of disability, her testimony and previous work experience, and the treating and examining physicians' opinions. She then evaluated Flynn's claim under the five-step process as prescribed by the Social Security regulations. *See* 20 C.F.R. § 404.1520(a)(4). First, the ALJ found that Flynn was not engaged in substantial gainful activity. *See* § 404.1520(a)(4)(i). Second, the ALJ held that Flynn had a combination of impairments considered severe based on the requirements of § 404.1520(c). *See* § 404.1520(a)(4)(ii). Third, the ALJ determined that Flynn's combination of impairments was not listed in or medically equal to one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* § 404.1520(a)(4)(iii). At the fourth step, the ALJ found that Flynn's combination of impairments did not prevent her from performing her past relevant work as she performed them or as generally performed within the economy. *See* § 404.1520(a)(4)(iv).

In concluding that Flynn could perform her past relevant work, the ALJ found that Flynn had the residual functional capacity ("RFC") to "lift, carry, push, or pull

20 pounds maximum occasionally, but only 10 pounds frequently [and] sit, stand, or walk up to 6 hours each throughout the course of a normal 8-hour workday." The ALJ also concluded that Flynn had no significant limitations relating to her mental capabilities. The ALJ considered the medical evidence, Flynn's testimony and her observation of Flynn's ability to sit through the one-hour hearing "without apparent difficulty, discomfort, or level '7-8' pain." Although not necessary at the fourth step, the ALJ also considered the vocational expert's testimony that, based on the RFC determined by the ALJ, Flynn could perform her past relevant work as a receptionist/billing clerk both as she performed it and as performed in the national economy and as a cashier/checker as performed in the national economy. The ALJ then held that Flynn was not disabled at any time from her alleged onset date through the date of the decision. On November 16, 2006, the district court affirmed the ALJ's decision. Flynn appeals.

## II.    DISCUSSION

"We review de novo a district court decision upholding the denial of social security benefits." *Lauer v. Apfel*, 245 F.3d 700, 702 (8th Cir. 2001). When reviewing the ALJ's decision, we "determine whether it is supported by substantial evidence on the record as a whole." *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Id.* (quotation omitted). "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Id.* "If, after conducting this review, we find that it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Secretary's findings, we must affirm the decision of the Secretary." *Id.* (internal quotation and alteration omitted).

The ALJ conducts the five-step evaluation as listed in 20 C.F.R. § 404.1520. *Id.* At the fourth step, the ALJ determines "whether the claimant's RFC is sufficient for her to perform her past work." *Id.* An RFC is a medical question, and the ALJ's determination of a claimant's RFC "must be supported by some medical evidence of the claimant's ability to function in the workplace." *Id.* at 619; *see also Lauer*, 245 F.3d at 704. The ALJ also considers evidence such as the "observations of treating physicians and others, and an individual's own description of his limitations." *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000). At this fourth step, the ALJ, while not required to, may also consider a vocational expert's testimony in determining whether a claimant can perform his past work. *Wagner v. Astrue*, 499 F.3d 842, 853-54 (8th Cir. 2007).

When determining whether a claimant is disabled, "[t]he ALJ [has] a duty to evaluate the medical evidence as a whole." *Casey v. Astrue*, 503 F.3d 687, 691 (8th Cir. 2007). "A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *House v. Astrue*, 500 F.3d 741, 744 (8th Cir. 2007) (internal quotation omitted). "However, while entitled to special weight, it does not automatically control, particularly if the treating physician evidence is itself inconsistent." *Id.* (internal quotation omitted). Additionally, "[a]n ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." *Casey*, 503 F.3d at 691-92. If the ALJ does not find any of the medical opinions credible, then she should develop the record further to include medical evidence of a claimant's limitations. *Lauer*, 245 F.3d at 704.

Flynn argues that the ALJ discredited all of the medical evidence and concluded on her own that Flynn could "lift, carry, push, or pull 20 pounds maximum occasionally, but only 10 pounds frequently [and] sit, stand, or walk up to 6 hours

each throughout the course of a normal 8-hour workday."[2]  Flynn also argues that the ALJ discredited all of the medical evidence concerning Flynn's mental restrictions before concluding she had no significant limitations relating to her mental capabilities. The Commissioner responds by stating that the ALJ did not discredit all of the medical evidence and may consider all relevant evidence in coming to this determination.  He argues that substantial evidence supports the ALJ's RFC determination based on the physicians' reports and Flynn's daily activities.

After reviewing the record before the ALJ, we find substantial medical evidence to support the ALJ's conclusions concerning Flynn's RFC.  First, the record contains substantial evidence, including medical evidence, that Flynn could lift twenty pounds occasionally and ten pounds frequently.  While Dr. Radia diagnosed Flynn with fibromyalgia, she found that Flynn had normal muscle strength and good mobility. Dr. Stoken also determined that Flynn had full muscle strength.  Drs. Radia, Stoken, Alexander, Simmons and Kuhl continuously told Flynn to exercise.  However, Dr. Koons and Dr. May, state agency medical consultants, determined that Flynn could only lift ten pounds occasionally and less than ten pounds frequently.  The ALJ noted, though, that Dr. Koons and Dr. May did not review the treating physicians' reports. Substantial evidence supports the ALJ's decision to give controlling weight to the findings by Flynn's treating physicians that Flynn had normal and full muscle strength and not to the lifting assessments by Dr. Koons and Dr. May, non-treating consultants.

---

[2]While the ALJ wrote in her decision that Flynn had the RFC to "sit, stand, or walk up to 6 hours *each* throughout the course of a normal 8-hour workday," the transcript of the hearing and the ALJ's hypothetical question to the vocational expert do not reflect that the ALJ used the word "each" in describing her determination of Flynn's RFC.  In deciding whether substantial evidence supported the ALJ's determination of Flynn's RFC, we conclude the ALJ determined that Flynn would be able to do a combination of sitting, standing and walking for six hours in an eight-hour workday.  Therefore, we review the medical evidence to determine whether it supports the conclusion that Flynn could sit, stand and walk for six hours in an eight-hour workday.

*See Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (stating that a treating physician's opinion is entitled to substantial weight).

Substantial evidence also supports the ALJ's decision to give controlling weight to Dr. Radia's repeated findings that Flynn had normal muscle strength, and not to Dr. Radia's response to the questionnaire provided to her by the Social Security Administration in preparation for Flynn's hearing, to determine Flynn's RFC. Dr. Radia's internally inconsistent questionnaire responses concerning Flynn's lifting abilities did not warrant controlling weight. Dr. Radia rejected the state agency's assessment that Flynn could lift ten pounds occasionally but then wrote that Flynn could lift ten pounds occasionally. She rejected the state agency's assessment that Flynn could lift ten pounds frequently and instead wrote that Flynn could lift twenty-five pounds frequently. With these internal inconsistencies, the ALJ properly gave greater weight to Dr. Radia's treatment notes that Flynn maintained normal muscle strength. *See Davidson v. Astrue*, 501 F.3d 987, 990-91 (8th Cir. 2007) (finding an ALJ correctly discounted a physician's assessment report when his treatment notes contradicted the report).

In addition to this medical evidence, the ALJ discussed Flynn's testimony, her behavior at the hearing and the vocational expert's testimony. *See McKinney*, 228 F.3d at 863-64. Despite Flynn testifying that traveling in a car was unbearable, she traveled over an hour in a car to get to the hearing, and the ALJ observed that she then sat through the one-hour hearing without apparent discomfort. Flynn also recently traveled to Mexico for her son's wedding and only suffered from a headache. While the ALJ did not have to consider the vocational expert's testimony at the fourth step of the process, she did pose a hypothetical question to the expert. The vocational expert testified that Flynn would be able to perform her past work as a receptionist as she performed it and as a cashier as performed in the national economy. Since the ALJ properly considered all of the evidence, provided her reasoning for discounting certain portions and based her conclusion on the remaining portions, substantial evidence supports her conclusion concerning Flynn's lifting capability.

Next, the record includes substantial medical evidence to support the ALJ's finding that Flynn could sit, stand and walk for six hours in an eight-hour workday. Dr. Koons and Dr. May concluded that Flynn could sit for six hours in an eight-hour workday and walk and stand for at least two hours in an eight-hour workday. The ALJ appeared to rely on these medical assessments. *See Casey*, 503 F.3d at 692-93. She also referenced other evidence that supported the conclusion that Flynn could sit for six hours and walk and stand for at least two hours in an eight-hour workday. She discussed the treating physicians' recommendations to Flynn that she exercise, Dr. Kuhl's decision to release Flynn to full activities after her appendectomy, and Dr. Reeve's opinion that Flynn's fibromyalgia was stable.

In coming to her RFC assessment relating to Flynn's ability to sit, stand and walk for six hours in an eight-hour workday, the ALJ also properly considered and discounted Dr. Radia's questionnaire response that Flynn could only sit less than six hours a day because of the internal inconsistencies in the questionnaire and her previous treatment notes indicating that Flynn was improving. *See Davidson*, 501 F.3d at 990-91. The ALJ also did not give controlling weight to Flynn's testimony concerning her restrictions because Flynn had the ability to travel to Mexico and to the hearing, she was able to sit through the one-hour hearing, and she still was able to perform some household chores, according to her responses on the April 2003 daily activities questionnaire. The ALJ properly determined which evidence deserved controlling weight, and substantial evidence supported her determination of Flynn's ability to sit, stand and walk for six hours in an eight-hour workday.

Finally, the record includes substantial medical evidence that Flynn did not have any significant mental limitations resulting from her depression. The ALJ discussed the findings of Dr. Wright and Dr. Notch, the non-treating state agency psychologists, before she determined that their findings of moderate limitations were not supported by the findings of Flynn's treating psychologist, Dr. Simmons, and the record as a whole. Dr. Simmons found that medication was helping Flynn's depression and Flynn was doing well psychologically. Substantial evidence supports

the ALJ's decision to accord greater weight to the opinion of Flynn's treating psychologist and discount the non-treating state psychologists' assessments after considering all of the evidence. *See Singh*, 222 F.3d at 452.

After considering all of the evidence in the record, both evidence that supports the ALJ's decision and detracts from the ALJ's decision, *see Cox*, 495 F.3d at 617, we find that substantial evidence supports the ALJ's decision. While it might have been possible to come a different conclusion from the evidence, we affirm the conclusion reached by the ALJ because it was supported by substantial evidence. *See id.*

## III. CONCLUSION

For the foregoing reasons, we affirm the district court's judgment affirming the ALJ's decision to deny social security disability benefits and supplemental security income.

_____