# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-1133
_____

Karen Ash,

*Plaintiff - Appellant,*

v.

Carolyn W. Colvin, Acting Commissioner of Social Security,

*Defendant - Appellee.*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Jonesboro

_____

Submitted: September 22, 2015
Filed: February 4, 2016

_____

Before WOLLMAN, COLLOTON, and KELLY, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Karen Ash appeals the judgment of the district court[1] affirming the denial of her application for Social Security disability insurance benefits and supplemental security income. We affirm.

_____

[1]The Honorable Joe J. Volpe, United States Magistrate Judge for the Eastern District of Arkansas, sitting by consent of the parties pursuant to 28 U.S.C. § 636(c).

Karen Ash applied for disability insurance benefits and supplemental security income, claiming a disability onset date of June 26, 2010. Ash asserted that she was unable to work due to a back injury, arthritis, depression, headaches, irritable bowel syndrome, problems with her hands and heels, and mild mental retardation. Ash had been employed at a Family Dollar store for approximately ten years before June 2010.

On October 15, 2010, Ash completed a Function Report outlining her daily activities in support of her claim. She stated that she lived alone and prepared her own meals. She did her own cleaning and laundry without help from others but noted that these chores sometimes took all day. Ash drove her mother's car and said that she went shopping with her mother for "basic stuff." Ash asserted that she could pay bills, count change, handle a savings account, and use a checkbook. Ash used a computer and spent time socializing with her daughter on Facebook but stated that she could not sit for a long period of time without back pain. She further reported difficulty lifting, bending, kneeling, squatting, and sitting.

Dr. Dennis Vowell conducted a mental diagnostic evaluation and intellectual assessment of Ash in November 2010. Ash reported that she had difficulty with reading comprehension but could read and understand the newspaper. Ash graduated from high school, although she was placed in resource classes for help with reading and math beginning in elementary school. Dr. Vowell administered a Wechsler Adult Intelligence Scale, Fourth Edition test (WAIS-IV), and Ash received a full scale IQ score of 57, a verbal comprehension index score of 70, a perceptual reasoning index score of 63, a working memory index score of 58, and a processing speed score of 62. Dr. Vowell observed that Ash was cooperative and appeared to put forth her best effort throughout the testing. He ultimately found the IQ test to be "a valid assessment of [Ash's] current intellectual functioning" and noted that her scores were "well below the average range in all areas assessed by the WAIS-IV." Dr. Vowell

concluded that "[c]urrent intellectual assessment, education history, and adaptive functioning indicate [Ash's] current level of intellectual functioning falls within the mild range of mental retardation."

In responding to a question about how Ash's mental impairments interfered with her daily adaptive functioning, however, Dr. Vowell described no interference. He noted that Ash was capable of driving unfamiliar routes, shopping independently, managing her own finances, and completing basic household chores and other basic activities of daily living. Dr. Vowell observed that Ash displayed "mild to moderate difficulty responding adequately to basic assessment of attention and concentration capacity." He further reported that Ash was capable of adequate and socially appropriate communication, was able to respond to questions without remarkable slowing or distraction, had adequate persistence, and was able to perform tasks within a basically acceptable time frame.

Dr. Abesie Kelly, a medical consultant, reviewed Ash's medical records in December 2010 at the request of the Social Security Administration. Dr. Kelly noted that Ash's IQ scores and placement in special education classes were consistent with a diagnosis of mental retardation. Yet Dr. Kelly observed that Ash's ten-year work history at Family Dollar was considered skilled employment. Dr. Kelly noted that while Ash may have some problems functioning, her "symptoms do not preclude her from engaging in simple, repetitive, routine tasks." Dr. Kelly opined that Ash was capable of performing work where interpersonal contact is incidental to work performed, where complexity of tasks is learned and performed by rote, where there are few variables and little judgment, and where the supervision required is simple, direct, and concrete—namely, unskilled work. A second medical consultant affirmed Dr. Kelly's assessment.

The agency denied Ash's claims after an initial review and on reconsideration. Ash requested a hearing before an administrative law judge ("ALJ"). At the hearing,

Ash testified that she formerly worked as a cashier at Family Dollar but left that job due to "management stress" and because she was denied leave to visit her daughter. Ash stated that she required frequent reminders to complete her tasks and that a new manager was less accommodating to her need for reminders than her previous supervisor. She testified that she could not calculate in her head the correct change to give a customer, but that she could distribute change when the cash register showed the proper amount. Ash stated that she required help in keeping a checking account, that her parents paid her utility bills, and that she received public assistance to pay her rent and buy food. Ash's father testified that he helped Ash with rent and transportation. Ash's father also said that he had to repeat things to Ash when he helped her with her schoolwork as a child.

A vocational expert testified that Ash's past work as a retail store cashier was classified as semi-skilled. The ALJ asked the vocational expert whether an individual with certain characteristics could perform Ash's past work: a person with Ash's age and education who was capable of light work with incidental interpersonal contact, who learned tasks through repetition and demonstration, who required few variables and little judgment in the work performed, and who required simple, direct, and concrete supervision. The vocational expert testified that such a person would be unable to perform Ash's past work due to the interpersonal contact required and the semi-skilled nature of the job. The vocational expert opined, however, that such a person could perform work as a housekeeper or a factory work assembler. The ALJ asked whether these jobs would remain available if the individual required eight hours of absence a month and monthly reminders of job duties, and the vocational expert stated that the factory work would be eliminated but that such a person could perform work as a housekeeper or a cafeteria attendant.

The ALJ concluded that Ash was not entitled to a conclusive presumption of disability because her impairments did not meet or medically equal one of the listed impairments in the social security regulations. The ALJ then found that Ash had the

residual functional capacity to perform light work and that jobs suitable for Ash existed in significant numbers in the national economy. The Appeals Council denied Ash's request for review. The district court upheld the Commissioner's decision. Ash appeals, arguing that the ALJ's conclusion is not supported by substantial evidence.

II.

We review *de novo* the district court's decision affirming the denial of social security benefits and will affirm "if the Commissioner's decision is supported by the substantial evidence on the record as a whole." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010) (internal quotation omitted). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000). To determine whether substantial evidence exists, "we consider evidence that supports the Commissioner's conclusion, along with evidence that detracts from that conclusion." *Carlson v. Astrue*, 604 F.3d 589, 592 (8th Cir. 2010). "If, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the decision of the Commissioner." *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004) (internal quotation omitted). We review any disputed legal conclusions of the ALJ *de novo*. *Carlson*, 604 F.3d at 592. The Administration has updated its regulations to use the term "intellectual disability" rather than "mental retardation," but the agency resolved this case under the former regulations, so we use the terminology that appears in the briefs and administrative decision.

The ALJ analyzed Ash's claim under the five-step sequential evaluation process used to consider disability claims. 20 C.F.R. §§ 404.1520, 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). At step one, the ALJ noted that Ash had not engaged in substantial gainful activity since June 26, 2010, the alleged onset date of her disability. At step two, the ALJ found that Ash had severe impairments in the

form of neck and back pain, headaches, mild mental retardation, and depression. Next, at step three, the ALJ concluded that Ash's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Proceeding to step four, the ALJ found that Ash had the residual functional capacity to perform light work with a variety of nonexertional limitations but noted that Ash was unable to perform her past work as a cashier. Finally, at step five, the ALJ determined that Ash remained able to perform other jobs in the national economy, such as housekeeper or cafeteria attendant, and therefore found that Ash was not disabled under the terms of the Social Security Act. Ash takes issue with the ALJ's conclusion at step three of the sequential evaluation.

Ash argues that the ALJ erred in finding that she did not meet the requirements for mental retardation in Listing 12.05C. A claimant who meets the listing at step three is considered conclusively disabled, and the analysis does not continue to steps four and five. 20 C.F.R. §§ 404.1520(d), 416.920(d); *Yuckert*, 482 U.S. at 141.

Listing 12.05C states:

12.05 *Mental Retardation*: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . .

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

-6-

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C (revised Sept. 3, 2013, to refer to "intellectual disability" rather than "mental retardation").

To meet the requirements of Listing 12.05, a claimant must demonstrate that she suffers from deficits in adaptive functioning that initially manifested during the developmental period. *See Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006). The claimant also must meet the requirements of one of the four subsections lettered A through D. These are separate and independent requirements. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A ("If your impairment satisfies the diagnostic description in the introductory paragraph [of Listing 12.05] and any one of the four sets of criteria, we will find that your impairment meets the listing."); *Cheatum v. Astrue*, 388 F. App'x 574, 576 (8th Cir. 2010) (per curiam); *see also Randall v. Astrue*, 570 F.3d 651, 656-62 (5th Cir. 2009) (per curiam).

As we understand the administrative decision, the ALJ found that Ash did not meet Listing 12.05C because she failed to show "deficits in adaptive functioning" as required by the opening paragraph of the listing. The ALJ acknowledged that Ash had IQ scores in the range required by Listing 12.05C but concluded that those scores were "not a true reflection of her adaptive functioning ability." The ALJ observed that Ash lived independently, performed personal care tasks and household chores, drove a car, used a computer, operated a cash register, and socialized with others. The ALJ found that Ash had only mild restriction in her activities of daily living and that she had moderate difficulties in social functioning, concentration, and persistence.

Ash argues that she exhibited significantly subaverage intellectual functioning that manifested itself prior to age 22. She cites her learning difficulties, her placement in special education classes, and her father's testimony that he had to repeat things often to Ash when she was growing up. Ash also asserts that she received special accommodations from her manager when she worked as a cashier, that she cannot calculate change in her head, that she needed help from her father to manage her

checking account, that she receives public assistance to pay her rent and to buy food, and that her parents help her to pay her utility bills. She relies on statements by Dr. Vowell that her "[c]urrent intellectual assessment, educational history, and adaptive functioning indicate [her] current level of intellectual functioning falls within the mild range of mental retardation."

Other medical evidence, however, supports the ALJ's findings. In the same report relied upon by Ash, Dr. Vowell was asked to address how Ash's mental impairments interfered with her day-to-day adaptive functioning. Dr. Vowell did not identify any interference and noted that Ash was capable of driving unfamiliar routes, shopping independently, managing her own finances, and completing basic household chores and activities of daily living. He observed that Ash displayed moderate difficulty sustaining attention and concentration but noted no other deficiencies in adaptive functioning. Dr. Kelly's report likewise observed that Ash has a ten-year work history and found Ash to be "adaptively functional." While evidence that Ash is able to perform work is not relevant if she otherwise meets the requirements of Listing 12.05C, *Yuckert*, 482 U.S. at 141, evidence of her ability to work is relevant to show whether or not she has demonstrated the required deficits in adaptive functioning. *Cheatum*, 388 F. App'x at 576 n.3. We thus conclude that substantial evidence supports the ALJ's conclusion that Ash failed to demonstrate deficits in adaptive functioning as required by Listing 12.05C.

Ash complains that the ALJ's determination at step two that she had a severe impairment of mild mental retardation necessarily implies that she has deficits in adaptive functioning at step three, so that the administrative decision is internally inconsistent. Citing the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition*, Ash observes that a medical diagnosis of mental retardation requires deficits or impairments in present adaptive functioning "in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure,

health, and safety." *Diagnostic and Statistical Manual of Mental Disorders* 46 (Am. Psychiatric Ass'n ed., 4th ed. 1994). She reasons that once the ALJ found a severe impairment of mild mental retardation at step two, the ALJ logically could not find that Ash lacked deficits in adaptive functioning for purposes of Listing 12.05C at step three.

The ALJ's findings in this case are not logically inconsistent. In finding that Ash had a "severe impairment" of "mild mental retardation" at step two, the ALJ cited Dr. Vowell's finding that Ash's IQ scores "were within the range of mild mental retardation" and noted his diagnosis of "mild mental retardation." A "severe" impairment at step two is one that "significantly limits" the claimant's "physical or mental ability to do basic work activities," 20 C.F.R. §§ 404.1520(c), 416.920(c), so the ALJ must have found that Ash's mental impairment satisfied this standard. But the analysis at step two did not require the ALJ to address whether Ash exhibited "deficits in adaptive functioning" within the meaning of Listing 12.05. When discussing Ash's impairment at step two, the ALJ relied on Dr. Vowell's opinion—including his failure to note any interference with day-to-day adaptive functioning—in determining that Ash "does not have significant limitations with day to day adaptive functioning." The ALJ concluded that the doctor's findings about Ash's adaptive functioning did not support a full scale IQ score of 57.

At step three, to determine whether Ash met or equaled the listing for "mental retardation," the ALJ addressed whether Ash manifested "deficits in adaptive functioning." The deficits that are necessary to meet Listing 12.05 do not necessarily mirror findings about "adaptive functioning" that accompany a medical diagnosis of "mild mental retardation." "[T]he medical standard for mental retardation is not identical to the legal standard." *Cox v. Astrue*, 495 F.3d 614, 618 n.4 (8th Cir. 2007). When defining "mental retardation" for purposes of Listing 12.05, the Social Security Administration declined to use the definition of "mental retardation" found in the *Diagnostic and Statistical Manual of Mental Disorders*. *See Maresh*, 438 F.3d at 899.

Because the listing is designed to identify persons who are unable to work, rather than to diagnose a medical condition, the inquiries into adaptive functioning may differ. *See generally* Comm. on Disability Determination for Mental Retardation, Nat. Research Council, *Mental Retardation: Determining Eligibility for Social Security Benefits* 22-24 (Daniel J. Reschly et al., eds., 2002). Thus, even assuming that the ALJ adopted Dr. Vowell's medical diagnosis of "mild mental retardation" at step two, the ALJ did not necessarily conclude that Ash was afflicted with "significantly subaverage general intellectual functioning with deficits in adaptive functioning" for purposes of Listing 12.05 at step three.[2]

Ash contends that the ALJ's decision conflicts with *Lott v. Colvin*, 772 F.3d 546 (8th Cir. 2014), where a claimant argued that an ALJ's findings of a severe impairment of mild mental retardation at step two and no deficits in adaptive functioning at step three were inconsistent. This court remanded the case for the ALJ "to resolve both the internal inconsistencies in her decision and the unexplained inconsistencies with [a clinical psychologist's] opinion." *Id.* at 551. The record in *Lott*, however, was materially different from the record here.

---

[2]The concurring opinion, citing decisions from other circuits, suggests that the limitations arising from a severe impairment of mild mental retardation at step two of the analysis must be the same as the deficits in adaptive functioning required to meet Listing 12.05 at step three. But the cited authorities do not address this question. The cases accept a definition of "adaptive functioning" drawn from the *Diagnostic and Statistical Manual of Mental Disorders* (4th ed.) (i.e., "how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting"), but they do not discuss whether deficits or impairments in as few as two of eleven areas of adaptive functioning for purposes of a *medical* diagnosis is equivalent to the "deficits in adaptive functioning" contemplated in Listing 12.05 that prevent a claimant from working.

The psychologist in *Lott* diagnosed the claimant with "mild mental retardation" by observation alone, without an IQ test. *Id.* at 550. The diagnosis was based in part on the claimant's "general level of adaptive functioning," as established by evidence that the claimant did not complete high school, could not read or understand newspapers, had a history of violent altercations, and was committed to the Arkansas State Hospital after attempting to burn down an occupied home. *Id.* at 548, 550-51. Despite finding a severe impairment of mild mental retardation at step two based on that evidence, however, the ALJ concluded at step three that the "claimant's own account of his functioning" and his work history precluded a finding that he had deficits in adaptive functioning. *Id.* at 551. The ALJ's conflicting assessment of adaptive functioning at two different steps of the analysis was internally inconsistent and inconsistent with the psychologist's opinion.

An inconsistency of the sort that plagued the administrative decision in *Lott* is not present here. The ALJ found at both steps two and three that Ash's adaptive functioning was not reflective of her IQ score and that she did not have significant limitations in day-to-day adaptive functioning. The ALJ relied on a reasonable interpretation of Dr. Vowell's report in making those findings. That the ALJ characterized Ash's impairment as mild mental retardation at step two did not preclude the ALJ on this record from finding at step three that Ash did not exhibit deficits in adaptive functioning. *Cf. Cox*, 495 F.3d at 618.

\*      \*      \*

For these reasons, we conclude that substantial evidence supported the ALJ's finding that Ash did not meet Listing 12.05C and that the ALJ's findings at step two and step three of the sequential evaluation were not inconsistent. The judgment of the district court is affirmed.

KELLY, Circuit Judge, concurring.

I concur in the outcome of this case. I write separately because I disagree with the court's analysis of the ALJ's findings at steps two and three. Ante at 9–10. A finding that a mental retardation[3] diagnosis is a "severe impairment" requires a finding that it "significantly limits" the claimant's "physical or mental ability to do basic work activities." I disagree, however, with the court's conclusion that "'deficits in adaptive functioning' within the meaning of Listing of 12.05" are substantively different than limitations on adaptive functioning for purposes of a step two diagnosis. Though I recognize that "[t]he medical standard for mental retardation is not identical to the legal standard," Cox v. Astrue, 495 F.3d 614, 618 n.4 (8th Cir. 2007), both require findings of either limitations or deficits in adaptive functioning. Courts have understood Listing 12.05C as simply adopting the medical definition of "adaptive functioning." See Talavera v. Astrue, 697 F.3d 145, 153 (2d Cir. 2012); Novy v. Astrue, 497 F.3d 708, 710 (7th Cir. 2007); O'Neal v. Comm'r of Soc. Sec., 614 F. App'x 456, 459 (11th Cir. 2015) (unpublished per curiam); Burbridge v. Comm'r of Soc. Sec., 572 F. App'x 412, 415 n.2 (6th Cir. 2014) (unpublished per curiam); cf. Diagnostic and Statistical Manual of Mental Disorders 46 (Am. Psychiatric Ass'n ed., 4th ed. 1994).

As I understand the administrative decision, the ALJ implicitly rejected Dr. Vowell's diagnosis of mild mental retardation at step two. Although the heading of step two identifies "mild mental retardation" as one of Ash's severe impairments, the ALJ immediately repudiated that finding, both with respect to the level of adaptive functioning and the IQ score that level of functioning implies. The ALJ did not expressly conclude that the mild mental retardation finding is not supported by the record, or that it does not amount to a severe impairment, but his reasoning explaining

---

[3]Like the court, I use the term "mental retardation" rather than the updated term "intellectual disability."

his step two findings was such that he cannot have found her to be mildly mentally retarded. This implicit conclusion is further supported by the ALJ's discussion at step three.

"We have often held that an arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where the deficiency probably has no practical effect on the outcome of the case." Bryant on Behalf of Bryant v. Apfel, 141 F.3d 1249, 1252–53 (8th Cir. 1998) (quotations and alterations omitted) (concluding that the ALJ's analysis at step three clarified the ALJ's "earlier imprecise wording" at step two where the ALJ identified headaches as a "severe impairment"). Based on my review of the record, I believe substantial evidence exists to support the ALJ's conclusion that Ash is not disabled. Accordingly, I concur.

_____