Margaret Earline **JOYNER**, Plaintiff,

v.

Michael J. **ASTRUE**, Commissioner of Social Security, Defendant.

No. C08–2007.

United States District Court, N.D. Iowa, Eastern Division.

Nov. 6, 2008.

Hugh M. Field, Beecher, Field, Walker, Morris, Hoffman & Johnson, PC, Waterloo, IA, for Plaintiff.

Stephanie Johnson Wright, U.S. Attorney's Office, Cedar Rapids, IA, for Defendant.

**RULING ON JUDICIAL REVIEW**

JON STUART SCOLES, United States Magistrate Judge.

## TABLE OF CONTENTS

I. INTRODUCTION .................................................1206

II. PRIOR PROCEEDINGS...........................................1206

III. PRINCIPLES OF REVIEW.......................................1207

IV. FACTS ........................................................1208
 A. Joyner's Education and Employment Background .....................1208
 B. Administrative Hearing Testimony ................................1208
 1. Joyner's Testimony .........................................1208
 2. Vocational Expert's Testimony ..............................1210
 C. Joyner's Medical History ......................................1211

V. CONCLUSIONS OF LAW ..........................................1215
 A. ALJ's Disability Determination ..................................1215
 B. Whether the ALJ Fully and Fairly Developed the Record ................1216
 1. Joyner's Credibility Determination ..........................1216
 2. VNS Implant ...............................................1218
 3. Dr. Targoff's Opinions .....................................1219
 4. The Hypothetical Question ..................................1220
 5. New Evidence Before the Appeals Council .....................1221

VI. CONCLUSION .................................................1221

VII. ORDER .....................................................1221

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 1) filed by Plaintiff Margaret Earline Joyner on January 31, 2008, requesting judicial review of the Social Security Commissioner's decision to deny her applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits. Joyner asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits and SSI benefits. In the alternative, Joyner requests the Court to remand this matter for further proceedings.

## II. PRIOR PROCEEDINGS

On November 10, 2004, Joyner applied for disability insurance benefits. On November 23, 2004, she applied for SSI benefits. In her applications, Joyner alleged an inability to work since April 25, 2003 due to depression, anxiety, fatigue, poor sleep, panic attacks, and difficulty leaving her home. Joyner's applications were denied on January 13, 2005. On June 23, 2005, her applications were denied on reconsideration. On July 25, 2005, Joyner requested an administrative hearing before an Administrative Law Judge ("ALJ"). On November 9, 2006, Joyner appeared with counsel, via video conference, before ALJ Andrew T. Palestini. Joyner and

vocational expert Vanessa May testified at the hearing. In a decision dated March 20, 2007, the ALJ denied Joyner's claim. The ALJ determined that Joyner was not disabled and not entitled to disability insurance benefits or SSI benefits because she was functionally capable of performing her past relevant work as a driver and other work that exists in significant numbers in the national economy. Joyner appealed the ALJ's decision. On January 9, 2008, the Appeals Council denied Joyner's request for review. Consequently, the ALJ's March 20, 2007 decision was adopted as the Commissioner's final decision.

On January 31, 2008, Joyner filed this action for judicial review. The Commissioner filed an answer on April 2, 2008. On June 4, 2008, Joyner filed a brief arguing there is not substantial evidence in the record to support the ALJ's finding that she is not disabled and that she could perform her past relevant work or other work that exists in significant numbers in the national economy. On August 4, 2008, the Commissioner filed a responsive brief arguing the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. Joyner filed a reply brief on September 2, 2008. On September 3, 2008, both parties consented to proceed before the undersigned in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter ... a judgment affirming, modifying, or reversing the decision of the Commissioner ... with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner ... as to any fact, if supported by substantial evidence, shall be conclusive ..." *Id.*

■ The Court must consider "whether the ALJ's decision is supported by substantial evidence on the record as a whole." *Vester v. Barnhart,* 416 F.3d 886, 889 (8th Cir.2005) (citing *Harris v. Barnhart,* 356 F.3d 926, 928 (8th Cir.2004)). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Id.* (citing *Sultan v. Barnhart,* 368 F.3d 857, 862 (8th Cir.2004)). Furthermore, "[s]ubstantial evidence is 'something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions does not prevent an administrative agency's findings from being supported by substantial evidence.'" *Baldwin v. Barnhart,* 349 F.3d 549, 555 (8th Cir.2003) (quoting *Cruse v. Bowen,* 867 F.2d 1183, 1184 (8th Cir.1989), in turn quoting *Consolo v. Fed. Mar. Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966)).

■ In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester,* 416 F.3d at 889 (citing *Guilliams v. Barnhart,* 393 F.3d 798, 801 (8th Cir.2005)). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Guilliams,* 393 F.3d at 801. "[E]ven if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by sub-

stantial evidence on the record as a whole." *Id.* (citing *Chamberlain v. Shalala,* 47 F.3d 1489, 1493 (8th Cir.1995)).

## IV. FACTS

### A. Joyner's Education and Employment Background

Joyner was born in 1957. She completed the tenth grade, and later earned her GED in 1998. The record contains a detailed earnings report for Joyner. The report covers Joyner's employment from 1990 to 2006. Joyner had no earnings from 1990 to 1994. From 1995 to 1997, she worked for Automotive Testing and Development Services, Inc. She earned approximately $4,000 in 1995 and 1996, and $11,264.92 in 1997. Joyner had no earnings in 1998. She worked in 1999 and earned $3,181.39. She had no earnings again in 2000. From 2001 to 2003, Joyner worked at Covenant Medical Center, Inc. She earned $5,160.14 in 2001, $20,321.45 in 2002, and $7,064.52 in 2003. She has had no further earnings since 2004.

### B. Administrative Hearing Testimony

#### 1. Joyner's Testimony

At the administrative hearing, Joyner's attorney questioned Joyner about her activities of daily living. Joyner testified that on a typical day, she wakes up at 6:00 a.m. or 7:00 a.m., and has her daughter make her coffee. According to Joyner, when her daughter leaves for school, she returns to her room. She testified that she stays alone in her room for the entire day. She stated that she doesn't watch T.V., read, or make meals for herself, she simply sits in her room all day.[1] Joyner further testified that she bathes and washes her hair about three times per week and dresses mostly in her pajamas, unless she has to leave the house. Joy-

ner's attorney also asked Joyner whether she receives help with her household duties:

Q: What duties do other family members or other people do for you that you previously did for yourself?

A: Basically [my daughter's] boyfriend comes over, and he'll cook dinner. He'll clean up the kitchen. He technically does things around the house, vacuum and stuff like that, that I'm just too tired to do.

Q: And does he take care of the laundry for instance?

A: Yes, he does.

Q: And what about the yard work?

A: Yes, he does.

Q: What yard work does he do?

A: Rakes and mows and edges.

Q: And is that stuff that you previously did?

A: Yes, I used to.

Q: And why don't you do it anymore?

A: I have no energy, and I don't get dressed.

Q: You just don't get up and get dressed anymore?

A: I just, no, I don't.

(Administrative Record at 408–09.)

Joyner's attorney also questioned Joyner about her mental health problems. When asked to describe her difficulty with panic attacks, Joyner explained that she starts sweating, her heart starts pounding, and she feels like she is going to have a heart attack. According to Joyner, she has panic attacks "pretty much" every day, especially when she is out of her house and around people. She testified that she sometimes has feelings of paranoia and

---

**1.** Specifically, Joyner testified that she stays in her room and "[I] just sit there and just, you know, and really do nothing and just sit there and rock." *See* Administrative Record at 421.

suspiciousness of people which causes her to withdraw and want to hide from people. Joyner's attorney questioned Joyner about her interactions with people:

Q: [H]ow much do you actually go out and be around people?

A: Not very often.

Q: In a 30–day period, how many days would you leave the house?

A: Probably twice.

(Administrative Record at 418.)

Joyner's attorney also asked Joyner whether she had problems with concentration. She replied that her mind often gets "sidetracked" and she has difficulty focusing on one particular issue at a given time. When asked to describe her difficulties with mood, Joyner explained that:

A: I get frustrated because I'm not feeling better. This, you know, I get over emotional. I cry a lot. I close myself in my room, sit on my bed and just rock. I have no energy, and I get aggressive sometimes at my daughter, and I'm just, I'm not stable.

(Administrative Record at 415.)

Joyner's attorney also asked Joyner to discuss the physical symptoms related to her mental health problems. According to Joyner, she suffers from headaches three to four times per week. She described her headaches as consisting of intense pain which last all day. She also testified that she has tremors in her hands which make it difficult for her to write or hold things. Joyner also indicated that she regularly gets sick to her stomach and sometimes has tightness in her chest, shortness of breath, and feels faint. When asked whether she has difficulty sleeping, Joyner stated that she typically gets up seven to ten times each night. She also testified

that she "always" feels fatigued and lacks motivation to do much of anything, including getting dressed.[2]

Joyner's attorney also inquired into Joyner's medications. She testified that she takes Effexor and Zoloft for depression, Alprazolam for anxiety, Hydrocodone for headaches, and Provigil to keep her awake. Joyner and her attorney had the following colloquy regarding her medications:

Q: Do the medications help you very much[?]

A: No, they don't.

Q: Do they have side effects?

A: I believe headaches is one ... and nausea.

Q: And sleepiness and waking at nights.

A: Right.

Q: Do they seem to improve your symptoms taking them?

A: No. This is why I chose to go the route of the surgical implant of the VNS as a desperate attempt to get well and so far, I'm a little disappointed right now or frustrated that it's not working, but I'm hanging on by a thread here.

(Administrative Record at 425.) With regard to the VNS (Vagus Nerve Stimulator) implant, Joyner explained that it is an implant similar to a pacemaker that sends electrical impulses to the vagus nerve. The purpose of the VNS implant is to treat depression for individuals that do not respond to anti-depressant medications. Joyner and her attorney had the following discussion of the VNS implant:

Q: And you've described this VNS surgery that you had. Has that, has that device been helping you?

2. Specifically, Joyner stated: "I just always feel fatigued, just tired, no motivation. I just, I couldn't get the energy to get dressed. I just, it was just hard for me to function on a daily basis." See Administrative Record at 419.

A: No, not yet.

Q: What did they indicate to you in terms of the time before that would be, whether it, that it might take to become effective?

A: It could take anywhere between three, six, nine, 12 months to a year or two. It depends on the person. There's no set time frame for each, you know, individual.

Q: And this delivers an electric shock to your vagus nerve and that's supposed to release the proper enzymes or whatever they are that go to your brain to avoid the depression. Is that—

A: Well, the latest thing that I read that it's supposed to increase the blood flow to your brain in areas where the antidepressants cannot get to.

Q: Okay. So it would, the increased blood would increase the amount of serotonin or whatever it is that makes people in balance, which makes people depressed and have anxiety. Is that—

A: I believe that's what they're saying.

(Administrative Record at 413–14.)

### 2. Vocational Expert's Testimony

At the hearing, the ALJ provided vocational expert Vanessa May with a hypothetical for an individual who has the ability to:

learn new duties if they are simple and repetitive. Because of problems coping with others[, the individual] should have no more than superficial interaction with the public or coworkers during her job duties, but the public and coworkers can be visibly present in the work areas. [The individual] should have limited verbal interaction because of the vagus stimulator.

In order to avoid unnecessary emotional demands in the workplace, the work should not involve very fast mental speed, inflexible deadlines, directly dealing with emergencies and complaints. [The individual] should not be required to remember new, detailed information or data to perform the job duties or to relate such detailed information or data to others. [The individual] should not have to adapt to frequent changes of duties or locations. . . . And also, let's keep [the individual] away from strong magnetic fields[.] . . .

(Administrative Record at 433–34.) The vocational expert testified that under such limitations, Joyner could perform her past relevant work as a driver, but not her past work as a receptionist. The vocational expert also testified that Joyner could perform the following work: (1) photocopy machine operator (800 positions in Iowa and 97,000 positions in the nation), (2) courier (1,200 positions in Iowa and 110,000 positions in the nation), and cafeteria attendant (3,000 positions in Iowa and 390,000 positions in the nation). The ALJ asked the vocational expert whether Joyner would be able to perform these jobs if one-third to two-thirds of the month she would be unable to attend the work site or remain at the work site because of anxiety or the inability to leave home. The vocational expert replied that such limitations would preclude full-time employment.

Joyner's attorney also questioned the vocational expert:

Q: . . . If [Joyner] were unable to sustain an ordinary routine without special supervision, would that preclude competitive employment?

A: Yes. . . .

Q: Okay. And if she were unable to complete a normal workday or workweek without interruptions from psychologically based symptoms, that would preclude work wouldn't it?

A: Yes.

Q: And if she were unable to perform at a consistent pace without a reasonable number or length of rest periods, that would preclude work?

A: Yes.

Q: I don't know if this is exactly the same as the Judge's question, but if she were to miss work more than three times a month, would that preclude work?

A: Yes.

(Administrative Record at 436–38.)

### C. Joyner's Medical History

On February 27, 2003, Joyner presented at the emergency room in Oelwein, Iowa, for an overdose of multiple prescription drug medications and alcohol. Joyner was transferred to Allen Memorial Hospital in Waterloo, Iowa. At Allen Memorial, Joyner was initially seen by Dr. Daniel Glascock, M.D., who admitted her to the hospital's intensive care unit for stabilization. Dr. Raja M. Akbar, M.D., another treating doctor, recommended that Joyner be transferred to the hospital's mental health unit once she was stable. Later, Joyner was evaluated by Ken Wernimont, LISW, ("Wernimont") a social worker at the hospital. Wernimont noted that Joyner had problems with depression "virtually all her life," and also noted that she had had problems with alcohol and drug abuse in the past. Wernimont further noted, however, that according to Joyner's daughter, Joyner's alcohol abuse was not current and she had not used drugs since 1998. Wernimont found that Joyner "does have some degree of awareness and is motivated for change. [She] however has much difficulty in maintaining stability of mood and can decompensate quite quickly."[3] Wernimont recommended continued hospitaliza-tion until she was stable and outpatient counseling to increase her coping skills. Joyner was discharged on March 6, 2003. Dr. Akbar noted that:

> [d]uring the hospital stay, [Joyner] participated well in the treatment program, benefitted from being in the hospital. Her depression gradually lifted. She tolerated medications without side effects.... On the day of discharge, she was in fairly good control, denied any suicidal intent and was making future plans appropriately.

(Administrative Record at 151.) Dr. Akbar prescribed Lexapro and Trazodone as medications and urged Joyner to contact the Northeast Iowa Mental Health Center for follow-up as treatment.

On December 11, 2003, Joyner met with Michael Atherley, P.A., ("Atherley") to talk about depression. Atherley's notes indicated that Joyner was a patient "who is well known to me and has a history of suicidal attempts and severe depression."[4] Atherley noted that Joyner's treatment history included the use of multiple antidepressant and antianxiety medications, but "nothing seems to help for any period of time."[5] Atherley indicated that Joyner had been doing well, but recently had become "very agitated." Atherley also noted that Joyner had contemplated suicide a few weeks ago, but those thoughts subsided. Upon examination, Atherley found that Joyner appeared to be in distress and was crying. Atherley further found her mood depressed and her affect flat. Atherley determined, however, that her judgment was good and she had insight into her problems. Atherley diagnosed her with severe depression. Atherley prescribed Prozac as treatment.

---

3. *See* Administrative Record at 153.

4. *See* Administrative Record at 193.

5. *Id.*

On February 10, 2004, Joyner met with Mervin Carnahan, LISW ("Carnahan"), a social worker in the psychiatry department at the Covenant Clinic in Waterloo, Iowa. Joyner reported that she was feeling "quite" distraught and had been feeling that way for a few weeks. Carnahan found that she was feeling dysphoric, helpless, and hopeless about her situation. Carnahan further determined:

> [Joyner] is looking at things quite negatively and while she recognizes this, she is having a hard time changing the pattern she is maintaining. She can recognize that she is caught up in a self-defeating pattern but also is having difficulty pulling herself out of this.

(Administrative Record at 258.) Carnahan recommended continued cognitive-behavioral psychotherapy and client-centered psychotherapy as treatment. On February 25, 2004, Carnahan found that Joyner's condition had improved. Carnahan noted that Joyner reported "feeling much better." On March 24, 2004, Carnahan opined that Joyner's condition had improved greatly. Carnahan noted that Joyner reported an "improved mood with better efforts to take care of herself."[6] On May 28, 2004, Carnahan noted that another treating source, Atherley, reported that Joyner was "doing [the] best she ha[d] for awhile."[7] On July 2, 2004, Carnahan found that Joyner "has been feeling and doing fairly well. Her mood is euthymic and thinking more rational. She has been taking her medication regularly with no side effects."[8]

On September 14, 2004, Joyner had an initial psychiatric evaluation with Dr. Sunita Kantamneni, M.D. Dr. Kantamneni noted that Joyner had a history of anxiety and depression for "a long time." Joyner reported an increased level of stress due to difficulties with one of her daughters. Upon examination, Dr. Kantamneni found that Joyner was cooperative, had mild psychomotor retardation, euthymic mood, appropriate affect, grossly logical and goal oriented thought processes, and fair insight and judgment. Dr. Kantamneni diagnosed her with major depression, recurrent, without psychotic symptoms, and anxiety disorder. Dr. Kantamneni suggested that Joyner taper off of Xanax, start Klonopin, and continue Celexa as treatment.

On September 18, 2004, Joyner presented to the emergency room at Mercy Hospital in Oelwein, Iowa, for suicide attempt with intentional prescription drug overdose. Joyner took 14 Xanax tablets and 15 Klonopin pills mixed with Vodka. Joyner informed Dr. Gregory Neyman, M.D., that she was trying to kill herself because she did not feel life was worth living. Dr. Neyman stabilized Joyner's condition and transferred her to the Covenant Medical Center in Waterloo, Iowa for admission into the intensive care unit and subsequent psychiatric evaluation. At her psychiatric evaluation, Joyner asserted that her overdose was not a suicide attempt. Instead, she claimed that she was having difficulty sleeping and her drug intake was an accidental overdose. Joyner also reported that she was under a lot of stress and had difficulties with one of her daughters. She was discharged from the hospital on September 22, 2004. Dr. P.B. Raju, M.D., noted that on the date of her discharge, Joyner was in a "fairly good mood." Dr. Raju recommended that she continue psychiatric therapy with Dr. Kantamneni and Carnahan as treatment.

On October 29, 2004, Joyner met with Dr. Kantamneni with complaints of having

---

6. *See* Administrative Record at 255.

7. *Id.* at 253.

8. *Id.* at 252.

difficulty falling asleep. Joyner informed Dr. Kantamneni that her lack of sleep was making her more irritable and tired the next morning. Dr. Kantamneni diagnosed Joyner with major depression, recurrent without psychotic symptoms and anxiety disorder. Dr. Kantamneni prescribed Trazodone to help Joyner with her sleeping problems.

On January 5, 2005, Dr. David G. Beeman, Ph.D., reviewed Joyner's medical records and provided Disability Determination Services ("DDS") with a Psychiatric Review Technique assessment and a mental residual functional capacity ("RFC") assessment for Joyner. On the Psychiatric Review Technique assessment, Dr. Beeman diagnosed Joyner with depression characterized by sleep disturbance, decreased energy, feelings of guilt and worthlessness, difficulty concentrating or thinking, and thoughts of suicide. Dr. Beeman also diagnosed Joyner with anxiety disorder. Dr. Beeman determined that Joyner had the following limitations: moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Beeman determined that Joyner was moderately limited in her ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, sustain an ordinary routine without special supervision, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept in-

structions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. Dr. Beeman concluded that:

> [Joyner's] treating psychiatrist and social worker both indicate diagnoses of moderate major depression with improvement over time. The current psychiatrist records reflect no significant concerns other than sleep currently. While [Joyner] has had times of marked restrictions, those have not remained consistently marked for a 12 months duration at any time. Further, it is expected that she will improve further with additional treatment.

(Administrative Record at 286–87.)

On February 10, 2005, Joyner had a follow-up appointment with Dr. Kantamneni. Joyner informed Dr. Kantamneni that she was concerned about being depressed and indicated that she was having difficulty getting along with her youngest daughter. Dr. Kantamneni increased Joyner's dosage of Cymbalta as treatment for her depression.

On February 24, 2005, Joyner met with Carnahan and reported that she was feeling "much better." Carnahan noted that her mood was much "brighter" and less depressed. Joyner's negative thinking also improved "with much less dwelling and being self-critical." [9] Carnahan also noted, however, that Joyner continued to have significant anxiety and didn't leave her home much. Carnahan recommended continued psychotherapy as treatment.

On April 17, 2005, Joyner was transferred from the Oelwein emergency room to the Covenant Medical Center emergen-

---

**9.** *See* Administrative Record at 241.

cy room for a drug overdose. In the afternoon, Joyner was depressed and upset over a confrontation she had had with her daughter. She drank "quite a few" gin and tonics and took a large dose of Xanax. Once stabilized, Joyner was admitted to the Covenant Medical Center Psychiatric Unit for further evaluation. Joyner was discharged on April 20, 2005, and was scheduled to see Dr. Kantamneni and Carnahan for counseling and psychiatric therapy as treatment.

On August 11, 2005, Joyner met with Dr. Kantamneni and reported that she was not "doing too well." Joyner informed Dr. Kantamneni that she was feeling "very tired" and could not get motivated to do anything. Dr. Kantamneni prescribed Geodon as treatment. On October 12, 2005, Joyner reported that she continued to have a depressed mood, tiredness, difficulty going to sleep, and no interest in doing anything. Dr. Kantamneni prescribed Ritalin and increased Joyner's dosage of Paxil as treatment. On January 21, 2006, Joyner informed Dr. Kantamneni that she continued to experience depressed mood and anxiety. She also reported that Ambien was helping her sleep "a little better." Dr. Kantamneni increased Joyner's dosage of Clonazepam and started her on Ritalin SR as treatment. On February 6, 2006, Joyner reported that she was doing "much better." She reported that overall she was less anxious and handling stress appropriately.

On August 14, 2006, Dr. Douglas J. Van Daele, M.D., diagnosed Joyner with depression refractory to medical therapy. Dr. Justin D. Hill, M.D., concluded that Joyner had a "long history of depression that has been refractory to medical therapy. She meets criteria for vagus nerve stimulator implantation." [10] Surgery was performed and Joyner had successful placement of a vagus nerve stimulator in the left neck.

On November 6, 2006, Dr. Matthew S. Targoff, D.O., filled out Mental Impairment Interrogatories provided by Joyner's attorney. Dr. Targoff diagnosed Joyner with major depression and anxiety. Dr. Targoff identified the following signs and symptoms of Joyner's mental impairments: decreased energy, feelings of guilt or worthlessness, mood disturbance, difficulty thinking or concentrating, intrusive recollections of a traumatic experience, sleep disturbance, recurrent panic attacks, anhedonia or pervasive loss of interests, psychomotor agitation or retardation, paranoia or inappropriate suspiciousness, suicidal ideation or attempts, social withdrawal or isolation, blunt, flat, or inappropriate affect, generalized persistent anxiety, and hostility and irritability. Dr. Targoff determined that Joyner's prognosis was fair to poor.

Dr. Targoff found that Joyner's mental abilities and the aptitude needed for unskilled work was poor for the ability to: remember work-like procedures, maintain regular attendance and be punctual within customary, usually strict tolerances, sustain an ordinary routine without special supervision, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, and get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. Dr. Targoff also found that Joyner had slight restriction of activities of daily living, moderate difficulties in maintaining social functioning, and frequent deficiencies of concentration, persistence, or

10. *See* Administrative Record at 315.

pace resulting in failure to complete tasks in a timely manner. Dr. Targoff also determined that Joyner's impairments or treatment would cause her to be absent from work more than three times per month.

On May 8, 2007, Janet M. Riley, LMHC ("Riley"), a mental health counselor, provided a letter discussing her counseling relationship with Joyner. The letter provides in pertinent part:

I first met Ms. Joyner the later part of March 2007 after Magellan Behavioral Health Services requested that I see [her] after being discharged from the hospital for a suicide attempt. At that time[, Joyner] would warrant a diagnosis of Major Depressive Disorder, Recurrent, Severe without Psychotic Symptoms. [Joyner] also exhibited symptoms of Posttraumatic Stress Disorder, Chronic. The PSTD is cued by stimuli in which Ms. Joyner associates past stressors and may be triggering her panic attacks.

Further interactions and evaluation of [Joyner] revealed characteristics of Borderline Personality Disorder and may explain why Ms. Joyner does not respond to the antidepressants medication as one would expect.

Due to the complexity of this case ongoing treatment is necessary to restore this individual to some level of normal functioning. Furthermore, it is my professional belief that without medication and therapy [Joyner] is at risk of committing suicide.

(Administrative Record at 397.)

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

█ The ALJ determined that Joyner is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)-(f); *Bowen v. Yuckert*, 482 U.S. 137, 140–42, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir.2007); *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003). The five steps an ALJ must consider are:

(1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir.2005) (citing *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir.2004)); *see also* 20 C.F.R. § 404.1520(a)-(f). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Eichelberger*, 390 F.3d at 590–91 (citing *Ramirez v. Barnhart*, 292 F.3d 576, 580 (8th Cir.2002)).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he [or she] is unable to perform his [or her] past relevant work." *Frankl v. Shalala*, 47 F.3d 935, 937 (8th Cir.1995) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir.1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id.* The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. " 'It is the ALJ's respon-

sibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his [or her] limitations.'" *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir.2005) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001)).

The ALJ applied the first step of the analysis and determined that Joyner had not engaged in substantial gainful activity since her alleged disability onset date, April 25, 2003. At the second step, the ALJ concluded, from the medical evidence, that Joyner had the following severe combination of impairments: depression, anxiety, history of nonsevere carpal tunnel, and nonsevere narcolepsy controlled by medication. At the third step, the ALJ found that Joyner did not have an impairment or combination of impairments listed in "[20 C.F.R. § 404,] Appendix 1, Subpart P, Regulations No. 4 [(the Listing of Impairments)]." At the fourth step, the ALJ determined Joyner's RFC as follows:

[Joyner] can do all previously learned functions. She can also learn new duties if the new duties are simple and routine. Because of problems coping with others, she should have no more than superficial interaction with the public, although the public may be present in the work area. She should have no more than superficial interaction with coworkers when performing the job duties, but other workers may be physically present in the work area. In order to avoid unnecessary emotional demands, the work should not involve very fast mental speed[,] inflexible deadlines[, or] direct dealing with emergencies and complaints. [Joyner] should not be required to remember detailed information/data to do the job duties; relate such detailed information or data [to] others; adapt to frequent changes of duties and locations. She should avoid strong magnetic fields.

(Administrative Record at 26.) Using this RFC, the ALJ determined that Joyner could perform her past relevant work as a driver. The ALJ further determined that based on her age, education, previous work experience, and RFC, she could also work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded Joyner was "not disabled."

## B. Whether the ALJ Fully and Fairly Developed the Record

Joyner contends that the ALJ erred in five respects. First, Joyner argues that the ALJ failed to properly evaluate her subjective complaints of disability. Second, Joyner argues that the ALJ failed to fully and fairly develop the record with regard to her VNS implant. Third, Joyner argues that the ALJ failed to properly evaluate the opinion of Dr. Targoff. Fourth, Joyner argues that the ALJ erred by posing an incomplete hypothetical question to the vocational expert which was not supported by substantial evidence. Fifth, Joyner argues that the Appeals Council failed to consider new evidence she supplied to it after the ALJ's decision.

### 1. Joyner's Credibility Determination

Joyner argues that the ALJ failed to properly evaluate her subjective complaints of disability. Joyner maintains that the ALJ's credibility determination is not supported by substantial evidence. The Commissioner argues that the ALJ properly considered Joyner's testimony and properly evaluated the credibility of her subjective complaints.

When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard them "solely because the objective medical evidence does not fully support them." *Polaski*, 739 F.2d at 1322. However, the absence of

objective medical evidence to support a claimant's subjective complaints is a relevant factor for an ALJ to consider. *Gowell v. Apfel,* 242 F.3d 793, 796 (8th Cir. 2001) (citation omitted). "The [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski,* 739 F.2d at 1322. Subjective complaints may be discounted if inconsistencies exist in the evidence as a whole. *Pelkey v. Barnhart,* 433 F.3d 575, 578 (8th Cir.2006) (citing *Polaski,* 739 F.2d at 1322). However, the ALJ must give reasons for discrediting the claimant. *Id.* (citing *Strongson,* 361 F.3d at 1072). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel,* 240 F.3d 1145, 1148 (8th Cir.2001) (citing *Pena v. Chater,* 76 F.3d 906, 908 (8th Cir.1996)); *see also Guilliams,* 393 F.3d at 801 (explaining that deference to an ALJ's credibility determination is warranted if the determination is supported by good reasons and substantial evidence). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Wagner v. Astrue,* 499 F.3d 842, 851 (8th Cir.2007) (quoting *Pearsall,* 274 F.3d at 1218).

■ In his decision, the ALJ properly set forth the law for making a credibility determination under *Polaski* and the Social Security Regulations. In applying the law, the ALJ determined that Joyner's "allegations concerning the existence, persistence and intensity of symptoms and functional limitations are not given full weight or credibility, only such as reflected in the residual functional capacity assigned by the undersigned." [11] Specifically, the ALJ determined that:

> [Joyner] testified at the hearing that her daughter's boyfriend does household chores. [Joyner] proclaimed she had headaches several times per week. However, there is no indication that she has persistently complained of such throughout the time in question. There is no indication that any problem has existed for a 12 month continuous period despite use of appropriate medication. Although [Joyner] had alleged medications were not effective, her comment is not consistent with the record, which establishes the effectiveness of medications when used appropriately. [Joyner] alleged having panic attacks every day, with sweating, heart pounding, feeling of impending heart attack. She has complained of anxiety at times. However, she does not appear to have shared the occurrence of such symptoms of 'daily panic attacks' with her treating sources persistently. She maintained that she did not go out of the house very often, perhaps twice in a 30 day period. The treatment notes of her treating sources likewise do not reflect that she has persistently shared this seemingly significant flare of symptoms with her treating sources. Her statement is not consistent with her questionnaire. [Joyner] alleged she did nothing during the day and had always been fatigued. However, she had not made persistent complaints to treating sources throughout the time in question.... The inconsistencies undermine the undersigned's willingness to fully credit [Joyner's] alle-

---

**11.** *See* Administrative Record at 24.

gations concerning the existence, persistence and intensity of symptoms and functional limitations.

(Administrative Record at 23.) It is clear from the ALJ's decision that he considered and discussed Joyner's daily activities, treatment history, use of medication, and functional restrictions in making his credibility determination. Thus, having reviewed the entire record, the Court finds that the ALJ adequately considered and addressed the *Polaski* factors in determining that Joyner's subjective allegations of disability were not credible. *See Johnson,* 240 F.3d at 1148; *see also Goff,* 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints); *Tucker v. Barnhart,* 363 F.3d 781, 783 (8th Cir.2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered. *Brown v. Chater,* 87 F.3d 963, 966 (8th Cir.1996)."). Accordingly, because the ALJ seriously considered, but for good reasons explicitly discredited Joyner's subjective complaints, the Court will not disturb the ALJ's credibility determination. *See Johnson,* 240 F.3d at 1148.

### 2. VNS Implant

Joyner argues that the ALJ failed to develop the record with regard to Joyner's VNS implant because the ALJ did not obtain medical evidence concerning the purpose or use of VNS implants. Specifically, Joyner contends that her attorney: offered to provide the ALJ with information with regard to the VNS but the ALJ refused. The ALJ then failed to obtain proper information regarding the use of the VNS and failed to obtain

medical advice as to when the device is to be used.

(*See* Joyner's Brief at 26.)

The ALJ also has a duty to develop the record fully and fairly. *Cox v. Astrue,* 495 F.3d 614, 618 (8th Cir.2007); *Snead v. Barnhart,* 360 F.3d 834, 838 (8th Cir.2004); *Wilcutts v. Apfel,* 143 F.3d 1134, 1137 (8th Cir.1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that " 'deserving claimants who apply for benefits receive justice.' " *Wilcutts,* 143 F.3d at 1138 (quoting *Battles v. Shalala,* 36 F.3d 43, 44 (8th Cir.1994)). Furthermore, an ALJ "possesses no interest in denying benefits and must act neutrally in developing the record." *Snead,* 360 F.3d at 838 (citing *Richardson v. Perales,* 402 U.S. 389, 410, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). A reversal for failure to develop the record, however, is only warranted when such failure is unfair or prejudicial. *Shannon v. Chater,* 54 F.3d 484, 488 (8th Cir.1995) (citing *Onstad v. Shalala,* 999 F.2d 1232, 1234 (8th Cir.1993)).

In his decision, the ALJ notes that the VNS implant is "approved for low to moderate chronic depression, not severe depression, and only if long-term medications do not result in improvement." [12] The ALJ's description of the VNS device is consistent with Joyner's description of the device at the hearing.[13] The ALJ also noted that the VNS device was "implanted for [Joyner's] chronic depression. As of September 11, 2006, a pharmacist was notified to cancel [Joyner's] two remaining refills of the medication Xanax, which is consistent with the expected improvement from the stimulator." [14] Having reviewed

---

12. *See* Administrative Record at 24.

13. *Id.* at 405–06 ("I had a vagus nerve stimulator implant to treat treatment resistant de-

pression that does not respond to antidepressant medications.").

14. *Id.* at 23.

the entire record, the Court finds that the ALJ fully and fairly developed the record on the issue of Joyner's VNS implant. The Court further determines that the ALJ's findings are supported by substantial evidence in the record. *See Vester,* 416 F.3d at 889. The Court also finds that the ALJ's development of the VNS issue was not unfair or prejudicial to Joyner. *See Shannon,* 54 F.3d at 488. Therefore, the Court will uphold the ALJ's decision. *See Guilliams,* 393 F.3d at 801 ("[E]ven if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole.").

### 3. Dr. Targoff's Opinions

Joyner argues that the ALJ failed to properly consider and weigh the opinions of Dr. Targoff. Joyner claims that Dr. Targoff is a treating source who took over her treatment after the VNS device was implanted in August 2006.[15] Thus, Joyner contends that the ALJ should have considered Dr. Targoff's opinions under the "treating source rule."

An ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v. Astrue,* 477 F.3d 1037, 1041 (8th Cir.2007) (citing 20 C.F.R. § 404.1527(d)(2)). The opinion of a treating physician:

> should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

the other substantial evidence in the record.

*Singh v. Apfel,* 222 F.3d 448, 452 (8th Cir.2000) (citations omitted). The regulations provide that the longer the treating relationship between a physician and a patient, the more weight should be given to that treating physician's medical opinions. *See* 20 C.F.R. § 404.1527(d)(2)(I). Furthermore, an ALJ is "encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." *Singh,* 222 F.3d at 452. The regulations require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *Id.* "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel,* 239 F.3d 958, 961 (8th Cir.2001) (citing *Prosch v. Apfel,* 201 F.3d 1010, 1013 (8th Cir.2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.; see also Edwards v. Barnhart,* 314 F.3d 964, 967 (8th Cir. 2003) (If the doctor's opinion is "inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight."); *Strongson,* 361 F.3d at 1070 (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen,* 881 F.2d 561, 564 (8th Cir.1989) (the

---

15. *See* Joyner's Brief at 28 (Dr. Targoff "is in practice with Dr. Kantamneni and is clearly a Treating Source.").

resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

■ In his decision, the ALJ attributed no weight to Dr. Targoff's opinions.[16] Specifically, the ALJ found that:

A mental functional capacity assessment form was completed by [Dr. Targoff on] November 6, 2006. The undersigned attributes to the form no weight. Although from the same clinic as the treating psychiatrist, [Dr. Kantamneni,] the record does not establish that [Dr. Targoff] examined or treated [Joyner] for any length of time, if at all. The opinions expressed are totally inconsistent with the record as a whole. [Dr. Targoff] suggests [Joyner] has poor or no ability to get along with others. However, the treatment notes referred to [Joyner] as pleasant, and did not indicate persistent difficulties interacting with [her]. All acute symptoms have been due to arguments and problems with [Joyner's] daughters. [Dr. Targoff] has not had available all of the evidence and inconsistencies now available to the undersigned which establishes reduction or control of symptoms with appropriate use of medications and absence of substance abuse.

(Administrative Record at 23.) The Court finds that the ALJ properly considered and weighed the opinion evidence provided by Dr. Targoff and correctly pointed out that "the record does not establish that [Dr. Targoff] examined or treated [Joyner] for any length of time, if at all." Specifically, the Court notes that the only medical evidence in the record attributable to Dr. Targoff is the Mental Impairment Questionnaire he filled out in November 2006 at the request of Joyner's attorney. The Court also finds that the ALJ provided

"good reasons" for rejecting Dr. Targoff's opinions. *See* 20 C.F.R. § 404.1527(d)(2); *Strongson,* 361 F.3d at 1070; *Edwards,* 314 F.3d at 967. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams,* 393 F.3d at 801.

#### 4. *The Hypothetical Question*

■ Joyner argues that the ALJ's hypothetical questions to the vocational expert did not adequately describe her limitations because the ALJ failed to include her subjective allegations of disability and the opinions of Dr. Targoff in the questions. Hypothetical question posed to a vocational expert, including a claimant's RFC, must set forth his or her physical and mental impairments. *Goff,* 421 F.3d at 794. "The hypothetical question must capture the concrete consequences of the claimant's deficiencies." *Hunt v. Massanari,* 250 F.3d 622, 625 (8th Cir.2001) (citing *Taylor v. Chater,* 118 F.3d 1274, 1278 (8th Cir.1997)). The ALJ is required to include only those impairments which are substantially supported by the record as a whole. *Goose v. Apfel,* 238 F.3d 981, 985 (8th Cir.2001); *see also Haggard v. Apfel,* 175 F.3d 591, 595 (8th Cir.1999) ("A hypothetical question 'is sufficient if it sets forth the impairments which are accepted as true by the ALJ.' *See Davis v. Shalala,* 31 F.3d 753, 755 (8th Cir.1994) quoting *Roberts v. Heckler,* 783 F.2d 110, 112 (8th Cir.1985)."). In Sections *V.B.1* and *V.B.3* of this decision, the Court determined that the ALJ made a proper credibility determination for Joyner and properly discounted the opinions of Dr. Targoff. Therefore, the Court finds that the ALJ did not err

---

16. Dr. Targoff's opinions are presented in a document entitled "Mental Impairment Interrogatories" provided to Dr. Targoff by Joyner's attorney. *See* Administrative Record at 373–78. There are no other documents attributed to Dr. Targoff in the record.

by not including Joyner's subjective allegations and Dr. Targoff's opinions in the hypothetical questions. *See Forte v. Barnhart*, 377 F.3d 892, 897 (8th Cir.2004) (an ALJ need only include those work-related limitations that he or she finds credible).

### 5. New Evidence Before the Appeals Council

 Joyner argues that the Appeals Council failed to "consider evidence submitted to it." [17] In her brief, Joyner asserts the following conclusory proposition regarding the new evidence submitted to the Appeals Council:

> Quite clearly, the limitations contained in Mr. Riley's [sic] report, which was submitted to the Appeals Council, would preclude competitive employment. In fact, the second hypothetical question posed by the ALJ to the Vocational Expert that [Joyner] would miss work two or more times per month, would preclude competitive employment are limitations contained within the above stated limitations.

(*See* Joyner's Brief at 25.) 20 C.F.R. § 404.970(b) provides:

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

*Id.* In the Notice of Appeals Council Action, the Appeals Council stated that it "considered the additional evidence listed on the enclosed Order of Appeals Council." [18] The Appeals Council concluded that "the additional evidence ... do[es] not provide a basis for changing the Administrative Law Judge's decision." [19] This Court "may only review the ALJ's final decision, not the Appeals Council's non-final administrative decision to deny review." *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir.1992). Therefore, this Court has no jurisdiction to review the action of the Appeals Council. Furthermore, the letters provided by Riley do not contain supporting medical evidence and therefore do not overcome the substantial evidence which supports the ALJ's final decision. *Id.* at 823. Therefore, the Court finds no merit in Joyner's Appeals Council argument.

## VI. CONCLUSION

The Court finds that the ALJ made a proper credibility finding with regard to Joyner's subjective allegations of disability, fully and fairly developed the record with regard to Joyner's VNS implant, properly rejected the opinions of Dr. Targoff, and provided the vocational expert with appropriate hypothetical questions. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED:**

1. The final decision of the Commissioner of Social Security is **AFFIRMED;**

2. Plaintiff's Complaint (docket number 1) is **DISMISSED** with prejudice; and

---

**17.** *See* Joyner's Brief at 24.

**18.** *See* Administrative Record at 7.

**19.** *Id.* at 8.

3. The Clerk of Court is directed to enter judgment accordingly.