# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1126

_____

Sebastian Moore,                            *
                                            *
            Appellant,                      *
                                            *       Appeal from the United States
    v.                                      *       District Court for the
                                            *       Eastern District of Arkansas.
Michael J. Astrue, Commissioner            *
of Social Security,                         *
                                            *
            Appellee.                       *


_____

Submitted: September 23, 2010
Filed: October 20, 2010

_____

Before GRUENDER, ARNOLD, and SHEPHERD, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Sebastian Moore appeals the decision of the district court[1] affirming the decision of the Commissioner of Social Security to deny his applications for supplemental security income.  For the reasons discussed below, we affirm.

_____

[1]The Honorable Jerry W. Caveneau, United States Magistrate Judge for the Eastern District of Arkansas, presiding by consent of the parties pursuant to 28 U.S.C. § 636(c).

## I.    BACKGROUND

Moore, who was a minor when his original applications for benefits were filed, has been diagnosed since childhood with various mental and behavioral impairments. He also suffers from aphakia, the absence of the lens, in his left eye.  The extensive record in this case shows that Moore was frequently in trouble at school for truancy, alcohol and marijuana use, fighting, vandalism, and general defiance of authority. Socially, he was characterized as having a "poor attitude" toward other students.  On the other hand, he participated in high school team sports such as football and basketball.  He received a regular high school diploma with the assistance of special resource classes.  After high school, he continued to play basketball with friends, and he participated in church activities.  He also attended college, but his studies were interrupted by his arrest and incarceration for cocaine distribution.

As discussed in more detail below, Moore was evaluated by psychologists on several occasions throughout his childhood and early adulthood.  On a multitude of IQ tests, he scored within the range of 71 to 84.  This range is characterized as "borderline intellectual functioning" and is considered to be one step above mild retardation.  Occasionally, he received a component IQ score in the high 60s, a range associated with mild retardation.  Different practitioners rated various aspects of Moore's ability to function in a workplace as suffering anywhere from "slight" to "marked" impairment.

Moore's mother filed applications for supplemental security income on Moore's behalf in 1994 and in 1998.  Both applications were denied by the Commissioner. The district court vacated and remanded the Commissioner's decision on the 1994 application due to the absence of certain exhibits from the record, *Moore v. Barnhart*, No. 98-cv-63 (E.D. Ark. Jul. 18, 2002), and vacated and remanded the Commissioner's decision on the 1998 application on the agreement of the parties to develop the medical record, *Moore v. Barnhart*, No. 01-cv-152 (E.D. Ark. Oct. 7,

2002). The Commissioner eventually consolidated the two applications. After conducting a hearing in November 2007, an administrative law judge ("ALJ") denied both applications again, resulting in the decision on appeal here. Because Moore reached eighteen years of age in March 2003, the ALJ denied benefits under the childhood disability standard prior to March 2003 and under the adult disability standard thereafter. As Moore does not appeal the denial of childhood benefits, we address the decision only as it pertains to adult benefits.

With regard to the adult disability standard, the ALJ applied the familiar five-step process prescribed by the Social Security regulations for supplemental security income. *See* 20 C.F.R. § 416.920(a)(4). The ALJ first found that Moore had not engaged in substantial gainful activity. *See* § 416.920(a)(4)(i). The ALJ also found that Moore had the severe impairments of aphakia in the left eye, borderline intellectual functioning, learning disorder, oppositional defiant disorder, and adjustment disorder with depressed mood, but that these impairments did not meet or medically equal a listed impairment. *See* § 416.920(a)(4)(ii), (iii). The ALJ determined Moore's residual functional capacity, *see* § 416.920(a)(4)(iv), (e), to include the full range of work at all exertional levels, with the following non-exertional limitations: must avoid work that requires very good vision; has sufficient visual acuity to handle and work with large objects and avoid ordinary workplace hazards; able to handle simple job instructions; able to interact with supervisors, coworkers, and the general public on an infrequent basis; able to adapt to infrequent work changes; and capable of performing basic mental demands of simple, routine, and repetitive work activity at the unskilled task level. Finally, the ALJ found that Moore had no past relevant work, but that jobs existed in the regional and national economy that an individual with Moore's residual functional capacity could perform. *See* §§ 416.920(a)(4)(iv), (v), and 416.960(c). In that final step, the ALJ relied on the testimony of a vocational expert that a hypothetical individual with the limitations identified in Moore's residual functional capacity could perform occupations listed in the *Dictionary of Occupational Titles* ("*DOT*"), such as Hand Packager and

Laundry Worker. As a result, the ALJ denied benefits, and the Commissioner affirmed, making the ALJ's decision the official decision of the Commissioner.

On appeal to the district court, with respect to the denial of adult benefits, Moore argued that (1) the ALJ erred in failing to find that Moore met a certain disability listing based on mental retardation; (2) the ALJ's hypothetical to the vocational expert misstated Moore's residual functional capacity by failing to incorporate certain limitations found by two examining psychologists, Dr. Maddock and Dr. DeRoeck; and (3) the *DOT* descriptions of the jobs identified by the vocational expert were in conflict with certain limitations in the hypothetical. The district court held that the Commissioner's decision was supported by substantial evidence. Now, on appeal to this Court, Moore only renews his challenges to the hypothetical and the jobs identified by the vocational expert.

## II.    DISCUSSION

"We review *de novo* a district court decision upholding the denial of social security benefits." *Lauer v. Apfel*, 245 F.3d 700, 702 (8th Cir. 2001). "Our role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole." *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (quotation omitted). "Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." *Id.* "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Nevertheless, if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, we must affirm the ALJ's decision. *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005).

First, Moore contends that the medical opinions of Dr. Maddock and Dr. DeRoeck, the only two psychologists to examine him as an adult, demand a finding that he is in incapable of interacting with supervisors, coworkers, and the general public. The ALJ's residual functional capacity finding stated that Moore could interact with supervisors, coworkers, and the general public on an "infrequent basis." Although the ALJ must consider all relevant evidence, rather than just evidence from medical professionals, the record must contain at least some medical evidence to support the ALJ's determination of residual functional capacity. *Lauer*, 245 F.3d at 703-04.

Dr. Maddock examined Moore in June 2003 and rated Moore's ability to "Deal with Public" and "Interact with Supervisor(s)" as "None," and his ability to "Relate to Co-Workers" as "Poor." However, Dr. DeRoeck examined Moore in May 2005 and concluded that Moore had only "slight" limitations in his ability to interact with the public, supervisors, and coworkers. Dr. DeRoeck examined Moore again in January 2007, while Moore was in prison, and noted an increased number of "altercations in social settings" and decreased "judgment" in social settings. At that time, Dr. DeRoeck found "moderate" limitations in Moore's ability to interact with supervisors and coworkers, and "marked" limitations in Moore's ability to interact with the public. On the January 2007 evaluation form, a "moderate" limitation is defined as "more than a slight limitation in this area but the individual is still able to function satisfactorily," while a "marked" limitation is defined as "a substantial loss in the ability to effectively function." Notably, the evaluation form also provided a designation of "extreme," defined as "no useful ability to function in this area," but this designation was not selected by Dr. DeRoeck. Although these medical evaluations provide some support for Moore's position that he had no useful ability to interact with supervisors, coworkers, or the general public in a work setting, they also provide medical evidence to support the alternative position taken by the ALJ that Moore could handle such interactions on an "infrequent" basis.

In addition to the checklist-based ratings provided by the examining psychologists, other evidence supports the ALJ's determination that Moore was at least capable of "infrequent" interaction with potential coworkers and supervisors and the general public. For example, Dr. Maddock noted at the 2003 examination that Moore "is able to maintain appropriate behavior when he is in the presence of his peers," that it "was easy to get him to laugh," and that he "has a predictable sense of humor." Dr. DeRoeck noted at the 2005 examination that Moore "attends church and is involved with the church family" and "play[s] sports at a local park with friends," and he noted at the 2007 examination that Moore "has been involved in some kitchen work" and continued to participate in interactive activities such as basketball and card-playing while in prison. In this case, the ALJ's determination that Moore was capable of interacting with supervisors, coworkers, and the general public on an "infrequent" basis, rather than not at all, is supported by substantial evidence in the record as a whole. *See Page*, 484 F.3d at 1042.

Second, Moore argues that the ALJ should have included additional limitations in his residual functional capacity based on Dr. Maddock's June 2003 evaluation. Dr. Maddock rated Moore's ability to follow work rules, use judgment, deal with work stress, and function independently as "None," and he rated Moore's ability to maintain attention and concentration as "Poor." The ALJ instead found that Moore had the residual functional capacity to "adapt to infrequent work changes" and to perform "simple, routine and repetitive work activity at the unskilled task level," and omitted any further limitations regarding work rules, use of judgment, work stress, or independent functioning.

Again, the record contains medical evidence to support the ALJ's position. For example, in May 2005, Dr. DeRoeck found that despite certain "'lapses' of sustained attention," Moore "was attentive, able to remain on task." Dr. DeRoeck concluded that Moore had only "slight" limitations in his ability to make simple work-related judgments and "moderate" limitations in his ability to respond appropriately to work

pressures. In his subsequent examination of Moore in January 2007, Dr. DeRoeck noted that Moore's "persistence in completion of tasks is favorable, though relatively slowed," and that he "may do better with repetitive tasks requiring [lesser] social involvement." While Dr. Maddock's evaluation might have supported a different position, there nevertheless is substantial evidence to support the ALJ's determination that Moore could "adapt to infrequent work changes" and perform "simple, routine and repetitive work activity."

Finally, Moore argues that there is not substantial evidence in the record to support the ALJ's finding that jobs exist in the national economy which Moore could perform. In particular, Moore argues that the *DOT* descriptions of the jobs identified by the vocational expert were in conflict with certain limitations in the hypothetical. Among other limitations, the hypothetical stated that the individual has "a 12th grade education with assistance by resource classes" and that he is capable of "carrying out simple job instructions" and performing "simple, routine and repetitive work activity at the unskilled task level." In response, the vocational expert identified the occupations of Hand Packager and Laundry Worker. According to the *DOT*, those occupations each require "Level 2" reasoning, defined as the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions." *DOT* at 1011.[2] Moore contends that the hypothetical could only be satisfied by occupations requiring "Level 1" reasoning, defined in the *DOT* as the ability to "[a]pply commonsense understanding to carry out simple one- or two-step instructions." *Id.*

The ALJ did not err in relying on the vocational expert's testimony. In the hypothetical, the ALJ did not limit "simple" job instructions to "simple *one- or two-step* instructions" or otherwise indicate that Moore could perform only occupations at a *DOT* Level 1 reasoning level. Indeed, the Level 2 reasoning definition refers to

---

[2]Page references are to the *Dictionary of Occupational Titles* (4th ed. 1991).

"detailed but *uninvolved*" instructions. *DOT* at 1011 (emphasis added). The dictionary defines "uninvolved" as "not involved," and in turn defines "involved" as "complicated, intricate." *Webster's Third New Int'l Dictionary* 1191, 2499 (2002). There is no direct conflict between "carrying out simple job instructions" for "simple, routine and repetitive work activity," as in the hypothetical, and the vocational expert's identification of occupations involving instructions that, while potentially detailed, are not complicated or intricate.

Moreover, the Level 2 reasoning definition is an upper limit across all jobs in the occupational category, not a requirement of every job within the category. "[A] claimant's reliance on the *DOT* as a definitive authority on job requirements is misplaced because *DOT* definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range." *Page*, 484 F.3d at 1045 (internal quotation marks omitted). "The DOT itself cautions that its descriptions may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities." *Wheeler v. Apfel*, 224 F.3d 891, 897 (8th Cir. 2000); *see DOT* at xiii. "In other words, not all of the jobs in every category have requirements identical to or as rigorous as those listed in the *DOT*." *Wheeler*, 224 F.3d at 897. There is nothing in the record to suggest that the vocational expert ignored the reasoning limitations in the hypothetical in determining that the listed occupations encompassed suitable jobs. *See Whitehouse v. Sullivan*, 949 F.2d 1005, 1006 (8th Cir. 1991) ("[T]he ALJ could properly assume that the expert framed his answers based on the factors the ALJ told him to take into account."). Because substantial evidence supports the ALJ's phrasing of the hypothetical to the vocational expert, and there was no conflict between the vocational expert's testimony and the *DOT*, the ALJ properly relied on the testimony. *See Page*, 484 F.3d at 1045.

After considering all of the evidence in the record, including both that which supports and that which detracts from the ALJ's decision, *see Cox*, 495 F.3d at 617,

we find that substantial evidence supports the ALJ's decision to deny benefits. While it might have been possible to come to a different conclusion from the evidence, we affirm the conclusion reached by the ALJ because it was supported by substantial evidence. *See Goff*, 421 F.3d at 789.

## III.  CONCLUSION

For the foregoing reasons, we affirm the district court's judgment affirming the ALJ's decision to deny supplemental security income.

_____