# United States Court of Appeals
### For the Eighth Circuit

_____

No. 16-4559

_____

Amy Thomas

*Plaintiff - Appellant*

v.

Nancy A. Berryhill, Acting Commissioner of Social Security

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Jonesboro

_____

Submitted: December 13, 2017
Filed: February 5, 2018

_____

Before SMITH, Chief Judge, ARNOLD and KELLY, Circuit Judges.

_____

ARNOLD, Circuit Judge.

Amy Thomas was thirty-four years old, the mother of a four-year-old son, and in the process of divorcing her second husband. A high-school graduate, she lived on her own, cared for herself and her indoor dog and cat, tended her home, managed her finances, and led a more-or-less independent life. She had custody of her son every other week and would care and provide for him as well, from preparing his breakfast

to putting him to sleep. She had a driver's license and could drive if need be, but grew anxious behind the wheel and preferred to have someone else take her on her weekly errands, which she handled herself. To pass the time, she enjoyed painting, television, and light reading. She was also morbidly obese, suffered from osteoarthritis, scored a full-scale IQ of seventy, experienced depression and anxiety, and said that she often relied on a parent to help her with chores that she could not do on her own. Thomas had also never held a job, going onto disability benefits at age eighteen and coming off them only when her husband's income rendered her ineligible. With her divorce looming on the horizon, she applied again for supplemental security income on the basis of disability, claiming that she could not work.

The Commissioner of Social Security denied Thomas's application, and an administrative law judge upheld the denial, finding that Thomas was not disabled since her impairments did not preclude her from performing substantial gainful work. *See* 42 U.S.C. § 1382c(a)(3)(B). The Appeals Council declined Thomas's request for further review, making the ALJ's decision the Commissioner's final one. *See Combs v. Berryhill*, 878 F.3d 642, 645 (8th Cir. 2017). Thomas sought judicial review of that decision, and the district court affirmed it in a conscientious opinion and order. She appeals from the judgment entered on that order, and we reverse and remand.

We review the district court's judgment de novo and will affirm if substantial evidence on the record as a whole supports the Commissioner's decision. *Vance v. Berryhill*, 860 F.3d 1114, 1117 (8th Cir. 2017); *see also* 42 U.S.C. § 405(g).

The ALJ used the Social Security Administration's five-step evaluation process to find that Thomas was not "disabled." *See* 20 C.F.R. § 416.920(a)(4). Thomas does not contest the ALJ's findings at the first three steps: that she has not engaged in substantial gainful work, that she has severe impairments that significantly limit her ability to perform basic work activities, and that her impairments do not render her per se disabled. She assigns error only to the ALJ's findings at the fourth and fifth

steps, where he expressly gave "little weight" to her treating physician's medical opinion in determining her residual functional capacity (RFC) and based his finding that she could perform a significant number of jobs in the national economy on a vocational expert's testimony that her RFC qualified her for two jobs in particular.

"The opinion of a treating physician is accorded special deference under the social security regulations" and "normally entitled to great weight." *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010). "However, the Commissioner may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence." *Fentress v. Berryhill*, 854 F.3d 1016, 1020 (8th Cir. 2017). The Commissioner may also assign "little weight" to a treating physician's opinion when it is either internally inconsistent or conclusory. *Chesser v. Berryhill*, 858 F.3d 1161, 1164–65 (8th Cir. 2017).

Thomas calls Dr. Roland Hollis her treating physician. At the hearing, she told the ALJ that she has visited Dr. Hollis, a primary-care doctor, every other month since 2005. But at the end of January 2013 when Dr. Hollis disclosed Thomas's patient file from January 2012 onwards, the file showed that she had seen him only twice: in July 2012 and January 2013. Only eleven other office visits appear in the record, all of which took place after Thomas had filed her new social-security application in late January 2013. The record supports a conclusion that Thomas exaggerated her pre-application relationship with Dr. Hollis and thus his ability to provide "a detailed, longitudinal picture" of her impairments—the primary reason that the social-security regulations accord treating physicians deference. *See* 20 C.F.R. § 404.1527(c)(2).

On appeal, Thomas does not assert that Dr. Hollis's file on her paints a detailed, longitudinal portrait of her impairments, nor does she contend that the file as a whole supports her claim of disability: She faults the ALJ only for assigning little weight to Dr. Hollis's medical opinions in the "two residual functional capacity assessments [he completed]—one in March 2013 and the other in March 2014." Those assessments,

-3-

however, consist of nothing more than vague, conclusory statements—checked boxes, circled answers, and brief fill-in-the-blank responses. They cite no medical evidence and provide little to no elaboration, and so they possess "little evidentiary value." *See Toland v. Colvin*, 761 F.3d 931, 937 (8th Cir. 2014). On that basis alone, the ALJ did not err in giving Dr. Hollis's RFC assessments little weight and relying more heavily on other opinions in the record. *See id.* at 935, 937.

As the district court noted, moreover, Dr. Hollis's earlier assessment of Thomas is inconsistent with his later one. In March 2013, Dr. Hollis found that Thomas could use her fingers to manipulate objects for an entire eight-hour workday, use her hands to grasp and twist objects for half of the workday, sit for sixty minutes in a row, and stand/walk for five minutes at a time. But one year later, he declared, without any explanation for the change, that Thomas could use her fingers and hands only for one-fifth of a workday, sit for ten minutes at a time, and stand/walk for no length of time. Dr. Hollis's clinical notes from Thomas's intervening office visits do not reflect that kind of escalation in the severity of her impairments: There is no mention of a difficulty with her hands or fingers or any indication she had acquired a problem with sitting, and the only specialist he recommended was a dietician to place her on a low-calorie diet. Since Dr. Hollis's more recent assessment was inconsistent with the trend line in his notes and his own earlier assessment, the ALJ did not err in rejecting those medical opinions. *See Boyd v. Colvin*, 831 F.3d 1015, 1021 (8th Cir. 2016).

The ALJ did not err in finding that Dr. Hollis's opinions were also inconsistent with the record as a whole. Dr. Hollis, as we already observed, stated in his March 2014 assessment that Thomas could not stand/walk for any length of time and could use her hands and fingers for only one-fifth of a workday. He asserted further that Thomas's impairments interfered constantly with the attention and concentration required for simple work-related tasks. Those core assessments were contradicted by the medical findings of multiple examining physicians. For example, Dr. Joseph Patterson found that Thomas had a perfectly normal grip in both hands, could hold

-4-

a pen and write, could touch fingertips to palm, could oppose thumbs to fingers, could pick up a coin, and could stand/walk without assistive devices. He confirmed that Thomas had osteoarthritis in her knees, but detected no joint deformity or instability and no muscle weakness or atrophy. Dr. Anita Gail Wells found "no evidence" that Thomas was unable "to cope with typical mental/cognitive demands of basic work-like tasks" and concluded that "[o]ther than being morbidly obese and [exhibiting a] slow gait," Thomas appeared able "to complete work related tasks in an acceptable timeframe." Thomas's own psychiatrist, Dr. W. Robert VanScoy, corroborated Dr. Wells's findings, remarking in multiple progress notes that Thomas's concentration, judgment, and insight were "good" and that her memory was "completely intact." The ALJ did not err in relying instead on those more thorough, detailed opinions. *See Fentress*, 854 F.3d at 1020.

Thomas's self-reported activities of daily living provided additional reasons for the ALJ to discredit Dr. Hollis's pessimistic views of her abilities. Thomas's activities—caring for her young son, preparing his meals, doing housework, shopping for groceries, handling money, watching television, and driving a car when necessary, among other things—showed that she could work. *See Roberson v. Astrue*, 481 F.3d 1020, 1025 (8th Cir. 2007); *see also Hacker v. Barnhart*, 459 F.3d 934, 937–38 (8th Cir. 2006); *Ellis v. Barnhart*, 392 F.3d 988, 995 (8th Cir. 2005). No one disputes that Thomas faces severe impairments and may regularly need assistance in her life. But it is implicit in the Commissioner's disability-evaluation scheme that even someone with "severe physical and mental impairments" may "nonetheless [be] able to work." *See Onstad v. Shalala*, 999 F.2d 1232, 1233, 1235 (8th Cir. 1993).

In sum, we hold that substantial evidence on the record as a whole supports the ALJ's decision to give little weight to Dr. Hollis's opinions in determining Thomas's RFC. Thomas does not otherwise dispute the ALJ's description of her RFC.

As part of Thomas's RFC, the ALJ determined that she could perform unskilled sedentary work limited to the complexity of rote "1 to 2 step tasks" that involve "few variables and little judgment." At the hearing, the ALJ asked the vocational expert whether he could identify any jobs for an individual of Thomas's age, education, RFC, and lack of work experience. The expert replied that he could, and he identified two jobs: "machine tending," and "new accounts clerk." Relying on the expert's testimony about those jobs, the ALJ found that the Commissioner had met her burden of proving that Thomas was not disabled because she could perform a significant number of jobs in the national economy. *See Gann v. Berryhill*, 864 F.3d 947, 952 (8th Cir. 2017). The Commissioner has conceded, however, that the expert erred in suggesting that machine tending was suitable work, so our review will focus only on whether the ALJ properly relied on the expert's testimony that someone with Thomas's RFC could handle the job requirements of a new accounts clerk.

The Commissioner has ruled that an ALJ may not rely on a vocational expert's testimony about the requirements of a job if an "apparent unresolved conflict" exists between that testimony and the job's description in the Dictionary of Occupational Titles (DOT). *See Moore v. Colvin*, 769 F.3d 987, 989–90 (8th Cir. 2014) (quoting SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000)). Thomas contends that a conflict marred the expert's testimony here that an individual with her RFC could perform the work of a new accounts clerk: Her RFC limited her to work involving the complexity of "1 to 2 step tasks," whereas the DOT provides that the job of a new accounts clerk involves level-three reasoning. *See* DOT 205.367-014. Level-three reasoning requires the ability to apply "commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form." *See Hulsey v. Astrue*, 622 F.3d 917, 923 (8th Cir. 2010). Level-one reasoning, by contrast, is described as the mere ability to apply "commonsense understanding to carry out simple one- or two-step instructions." *See Moore v. Astrue*, 623 F.3d 599, 604 (8th Cir. 2010). In other words, the expert testified that the hypothetical individual was qualified to handle a job that the DOT classifies as two reasoning levels higher than the limitations in her RFC. No one

-6-

raised that discrepancy at the hearing before the ALJ, and so the expert was not asked to explain why his testimony seemed to differ from the information in the DOT.

Since the DOT's definitions "are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range," not every position as a new accounts clerk has "requirements identical to or as rigorous as those listed in the DOT." *Id.* The Commissioner urges us to use that logic to find that there was no conflict between the vocational expert's testimony and the DOT. But to do so would stretch that logic beyond its limits and effectively deny that a conflict could ever be apparent. The DOT, for example, categorizes the job of a judge under level-six reasoning, *see* DOT 111.107-010, which is headily described as the ability to apply "principles of logical or scientific thinking to a wide range of intellectual and practical problems." *See Zavalin v. Colvin*, 778 F.3d 842, 847 (9th Cir. 2015). If the expert had testified that someone limited to rote "1 to 2 step tasks" could serve as a judge, the Commissioner's position would have us reason that applying principled thought to diverse problems represents the zenith of judging and that the expert must have meant, but neglected to say, that near the nadir are judicial positions that involve little more than inking a rubber stamp and applying it to sheets of paper. That seems to us a bridge too far.

We do not believe that the generic character of the DOT's job descriptions can in and of itself resolve a discrepancy between a job's requirements as set forth in the DOT and a vocational expert's testimony that someone with a more limited RFC is qualified to do it. *See* SSR 00-4p, *supra*, at *2. An expert generally seeks to resolve such a discrepancy by specifying that he has limited his testimony to only those jobs within the DOT description that someone with the relevant RFC can perform and, in more recent years under the Commissioner's policy on apparent unresolved conflicts, by explaining the basis of his opinion that jobs within that narrower subset exist in significant number. *See, e.g.*, *Gieseke v. Colvin*, 770 F.3d 1186, 1189 (8th Cir. 2014); *Welsh v. Colvin*, 765 F.3d 926, 929–30 (8th Cir. 2014); *Jones v. Astrue*, 619 F.3d 963,

976–78 (8th Cir. 2010); *Jones v. Chater*, 72 F.3d 81, 82 (8th Cir. 1995). As those cases indicate, we usually refer to the DOT's generic breadth to affirm that an ALJ permissibly viewed an expert's explanation as having eliminated the seeming conflict. We do not use it to deny that there ever was a conflict. The Commissioner invites us to hold nonetheless that an explanation was not necessary here since the ALJ could assume, based on the generic nature of the DOT, that such an explanation existed and the expert would have given it if asked. The Commissioner does not direct us to a published decision in which we have expressly held that, and we have found none. Such a holding, in any event, would be inconsistent with our longstanding precedent that an ALJ may not rely on unexplained expert testimony that someone with a particular RFC is qualified to do a job that the DOT describes as exceeding it. *See, e.g.*, *Montgomery v. Chater*, 69 F.3d 273, 275–77 (8th Cir. 1995); *Stathis v. Sullivan*, 964 F.2d 850, 852 (8th Cir. 1992). We have not deviated from that baseline when applying the Commissioner's policy on the unreliability of expert testimony that contains an "apparent unresolved conflict" with the DOT. *See Moore v. Colvin*, 769 F.3d at 989–90; *Kemp v. Colvin*, 743 F.3d 630, 632–33 (8th Cir. 2014).

By incorporating the definition of level-one reasoning into the RFC, the ALJ indicated "that [Thomas] could perform only occupations at [that] reasoning level." *See Moore v. Astrue*, 623 F.3d at 604. An apparent conflict thus existed between the vocational expert's testimony that someone limited to "1 to 2 step tasks" could work as a new accounts clerk and the DOT description that being such a clerk involves a higher level of reasoning. *See Rounds v. Comm'r of SSA*, 807 F.3d 996, 1003 (9th Cir. 2015); *see also Porch v. Chater*, 115 F.3d 567, 571–72 (8th Cir. 1997). Because that conflict was "apparent" and not just "possible," the ALJ needed to do more than have the expert affirm that his testimony was consistent with the DOT. *Moore v. Colvin*, 769 F.3d at 990. Under the Commissioner's own policy, the ALJ was required to elicit from the expert an opinion on whether there is a "reasonable explanation" for the conflict and determine whether the expert's testimony warranted reliance despite the conflicting information in the DOT. *Id.* at 989–90. In the absence of that inquiry, the

expert's testimony did not constitute substantial evidence on which the Commissioner could rely to conclude that Thomas was not disabled due to the existence of jobs in the national economy that she can perform. *See id.* at 990. Since it is not an issue in this appeal, we do not decide whether a "reasonable explanation" under that policy requires the expert to explain the basis of his testimony that a significant number of positions exist within a DOT job description that someone with a more limited RFC is qualified to perform. *See* SSR 00-4p, *supra*, at *2–3; *compare Welsh*, 765 F.3d at 930, *with Jones v. Chater*, 72 F.3d at 82.

We note further that the DOT's description of a new accounts clerk may conflict with Thomas's RFC in another way: The RFC limited her to work "where interpersonal contact is incidental," but the very first line in the DOT's description of that job says that a new accounts clerk "[i]nterviews customers applying for charge accounts." *See* DOT 205.367-014.

We vacate the district court's judgment and remand with instructions to return the case to the Social Security Administration for a new step-five determination.

———————————————